IN THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LRN CORPORATION<br>1100 GLENDON AVENUE, 7TH FLOOR<br>LOS ANGELES, CALIFORNIA 90024-3503,<br><br>PLAINTIFF,<br><br>v.<br><br>A. MERRILL PHILIPS<br>3303 WATER STREET, N.W., APT. 3N<br>WASHINGTON, DC 20007,<br><br>DEFENDANT. | )<br>)<br>)<br>)<br>)<br>)<br>)  CASE NO.<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**LRN CORPORATION'S
COMPLAINT FOR INJUNCTIVE RELIEF**

Plaintiff LRN Corporation, formerly known as LRN, The Legal Knowledge Company, ("LRN" or "Plaintiff"), through undersigned counsel, hereby brings this Complaint against Defendant A. Merrill Philips ("Philips" or "Defendant") and respectfully requests that this Court grant the preliminary injunctive relief, permanent injunctive relief, and other relief sought below against Philips for claims arising from (1) Philips' misappropriation and/or threat of misappropriation of trade secrets acquired while she was employed by LRN; and (2) Phillip's violation of contractual obligations relating to the non-disclosure or use of LRN's trade secrets.

**NATURE OF ACTION**

1.   This action for preliminary and permanent injunctive relief concerns Defendant Philips' misappropriation and/or threat of misappropriation of trade secrets that she acquired while working for LRN, and Phillip's breach of two Non-Disclosure Agreements that she entered into with LRN upon her inception of employment there.

## PARTIES

2. Plaintiff LRN is a corporation organized under the laws of the state of Delaware with its principal place of business in California at 1100 Glendon Avenue, 7th Floor, Los Angeles, California 90024-3503.

3. Defendant Philips is a natural person who resides at 3303 Water Street, N.W., Apt. 3N, Washington, DC 20007.

## JURISDICTION AND VENUE

4. This Court has diversity jurisdiction of this matter pursuant to 28 U.S.C. § 1332. Plaintiff and Defendant are citizens of different states and the matter in controversy exceeds $75,000 exclusive of interest, costs, and attorneys fees.

5. Preliminary Injunctive Relief is sought pursuant to Fed. Civ. R. 65(a).

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) as Defendant Phillips resides in the District of Columbia.

## FACTS

**A.    The Services LRN Provides Its Clients**

7. LRN is in the business of serving other businesses, by providing computer-based training and education. Among other products, LRN provides outside businesses with corporate governance, ethics and compliance programs to help outside businesses develop the knowledge, instructions and operational solutions to address legal, compliance and ethical issues.

8. LRN creates and markets products that combine legal knowledge, technology and hands-on expertise in the areas of complex corporate governance and compliance management in order to assist its clients. The products offered by LRN are primarily distributed through specially designed password-protected websites created for LRN's clients, and in written course materials. LRN regularly copyrights its products and courses, in order to avoid unauthorized or unlawful use by a competitor.

9. LRN offers its clients software products for delivery in multiple modes, including online access, and scaling to any bandwidth requirement. LRN also provides its clients with materials for facilitated sessions to be delivered in classrooms.

10. In order to serve the particular needs of its clients, LRN regularly receives highly confidential and sensitive information. LRN collaborates directly with its clients so that it can tailor the compliance and ethics learning materials to their specific needs. LRN has the capacity, for example, to provide materials that are customized to particular needs in multiple languages and localized to address local laws, cultures or customs. In several respects, LRN's products and services are often custom-made for particular clients with particular issues and needs.

**B.    LRN's Efforts To Maintain The Secrecy Of Its Confidential Proprietary Information And Its Trade Secrets**

11. LRN takes serious and strong efforts to protect its trade secrets and confidential proprietary information. It seeks to maintain the secrecy of such information by storing the data on company computers that are password protected and on password protected websites. The passwords to such information are provided only to those personnel with a need to have access to such information in order to meet client service requirements.

12. At the outset of employment, LRN requires each of its employees to agree to maintain the secrecy of LRN's trade secrets and confidential proprietary information, as well as the secrecy of the information provided to LRN by its clients. In its written policies and procedures, LRN consistently reminds its employees of the need to protect the company's trade secrets and confidential proprietary information.

13. In addition, LRN requires its employees to execute written non-disclosure agreements, as an irrevocable condition of employment. Such non-disclosure agreements set forth the confidential and proprietary nature of the information used to serve LRN's clients, as well as LRN's business interest in protecting such information. The agreements also prohibit employees from misappropriating its confidential proprietary information and trade secrets.

**C.    Philips Worked For LRN And Signed Two Non-Disclosure Agreements**

i.    The First Non-Disclosure Agreement

14.    Philips was an employee of LRN. She signed the first Non-Disclosure Agreement at the inception of her employment on December 9, 1999.

15.    The Non-Disclosure Agreement provided that:

(a)    LRN is engaged in the worldwide business of creating, managing and disseminating legal knowledge in such forms including, but not limited to, legal research and analysis, legal compliance and education, and knowledge management and knowledge management systems (the "Business");

(b)    LRN possesses significant technical know-how, sales know-how, trade secrets, and other confidential information (as defined below) that it has developed and will continue to develop, and which information is and will be proprietary to it and an exceedingly valuable asset;

(c)    my relationship with LRN has given me, and will continue to give me, access to and possession of such know-how, trade secrets and other Confidential Information;

(d)    LRN has a legitimate business interest in protecting the confidentiality of such know-how, trade secrets and other Confidential Information;

(e)    LRN is a pioneer in business of creating, managing, and disseminating legal knowledge and has developed, and will continue to develop significant goodwill, including but not limited to significant relationships and contacts with current and former customers and prospective customers; and

(f)    LRN has a legitimate business interest in protecting its goodwill from competition on my part to the extent provided below.

16.    The Non-Disclosure Agreement also provided that:

(a)    I will not (except as necessary to perform specific employment duties with LRN as directed by LRN), while in employ of LRN or thereafter, communicate or divulge to, or use for the benefit of myself or any other person, firm, association, or corporation, any Confidential Information.

> All records, files, memoranda, reports, price lists, customer lists, drawings, plans, sketches, documents, equipment, and the like, relating to the business of LRN or to any Confidential Information which I may use or prepare or come into contact with, shall remain the sole property of LRN, and I will return all such items to LRN immediately upon LRN's request, or immediately upon termination of my employment with LRN with or without such request.

> (b) For purposes of this agreement, "Confidential Information" includes any information concerning: any inventions; discoveries; improvements; processes; formulas; apparatus; equipment; methods; trade secrets; research; secret data; technical know-how; computer files and programs; sales know-how; jobs know-how; customer lists; the identity of any customers; customers, including but not limited to the identity of any products or services furnished to specific customers, and the nature of any customer preferences or other special requirements imposed by particular customers; prices, including but not limited to pricing methods, pricing formulas, margins, discounts, concessions, and adjustments; costs, including but not limited to researcher fees and any methods and formulas used in setting researcher fees; or any other confidential matters or information possessed, owned, or used by LRN that may be communicated to, acquired by, or learned by me in the course of or as a result of my employment with LRN or otherwise.

17. Furthermore, the Non-Disclosure Agreement required that Philips explicitly refrain from doing business with a competitor in a way that would disclose or potentially disclose LRN's trade secrets or confidential proprietary information.

    ii.    <u>The Second Non-Disclosure Agreement</u>

18. Philips also signed a separate Non-Disclosure Agreement on December 2, 1999. The second Non-Disclosure Agreement defined LRN's trade secrets and confidential proprietary information as follows:

> "Information" shall include all information relating to LRN, including but not limited to, its business, customers, personnel, independent contractors, researchers, financial condition, plans, products, intellectual property, analysis, projects, processes, systems, marketing, research or development activities, and all technical or scientific information or know-how of LRN or of any other person or entity as to which LRN is obligated to maintain its confidence, which is disclosed to Receiver [the LRN employee] either orally, or in diagram, electronic, digital, written or other recorded form that is not:

    (a)    already known to Receiver prior to the date of this Agreement or independently developed by Receiver after the date hereof;

    (b)    already publicly available or that becomes publicly available other than through a breach of this Agreement by Receiver; or

    (c)    rightfully received by Receiver from a third party without similar restriction from such party and the disclosure of which, by such third party does not constitute a violation of an obligation by such third party to LRN; or

    (d)    required to be disclosed pursuant to subpoena or other judicial process.

19. The second Non-Disclosure Agreement further provided, in pertinent part:

Receiver will hold in confidence the Information and will not, without the prior consent of LRN, either directly or indirectly:

    (a)    make or use, for Receiver's own benefit or otherwise, any portion of the Information, including but not limited to any commercial use thereof; or

    (b)    duplicate, disseminate, disclose or transfer any portion of the material or media on which the Information is presented to any other person, governmental agency, firm, business, or other entity.

20. Both Non-Disclosure Agreements provided that LRN would be entitled to injunctive relief for violations of the Non-Disclosure Agreements.

21. Both Non-Disclosure Agreements also explicitly provided that they would be governed by California law.

**D.    Philips' Job Duties With LRN**

22. Philips began her employment with LRN as Regional Director, Customer Relations.

23. LRN made a significant investment in Philips' training and development at the company.

24. Philips was assigned increasing responsibilities to sell LRN's products to current and potential customers. Philips was responsible for maintaining daily sales activity calls to

support a sales pipeline at a level required to achieve her sales target. Philips also was responsible for ensuring that new customer acquisition targets were met and that existing customer relationships were managed and expanded.

25. As Philips continued her employment at LRN, she was responsible for executing effective prospecting techniques to help her schedule appointments with General Counsel and other executives of clients and prospective clients. Philips routinely received confidential client contact and prospecting information from LRN, which was developed at LRN's expense for her use in sales presentations.

26. In addition, LRN provided Philips with confidential information to develop, deploy and share "best practices" relative to sales presentations and proposals. This information was provided so that it could be applied to the specific needs of LRN's clients, in order to customize LRN's message, as required.

27. Throughout her employment, LRN furnished Philips with updated data so that she could work closely with current prospective customers to ensure that they gain full value from their investment with LRN, and to ensure that LRN's clients and prospective clients kept abreast of current LRN products and services, so that she could increase the number of products and services purchased.

28. Philips successfully used the data provided by LRN to forge significant client relationships. During her employment with LRN, Philips was able to use LRN's internal resources to gain access to executives at several Fortune 1000 and other companies to make sales presentations. When Philips successfully completed a sale, the typical fees paid by the client to LRN amounted to several thousand dollars for each product or service purchased. Philips received commissions based on these sales.

    **E.**    **Phillip's Resignation From LRN**

29.    Philips resigned her employment with LRN, effective February 4, 2005. At the time of her resignation, Philips did not disclose that she intended to work for Midi Corp. ("Midi"), or any of LRN's competitors.

30.    At the time of Philips' resignation, Philips further stated that she would not sign an Intellectual Property and Confidentiality Employee Confirmation (the "Confirmation").

31.    The Confirmation provided, in pertinent part, as follows:

> LRN takes the protection of its intellectual property and confidential information very seriously. When you joined LRN you committed to help protect this information. We and our customers and partners appreciate your continuing efforts. Your responsibilities in this regard continue after your employment here.

32.    The Confirmation further provided as follows:

> You have agreed to maintain all of LRN and LRN's customers' confidential information in absolute secrecy. You should not take any materials containing confidential information with you. You may not directly or indirectly share or allow access to this information.

    **F.**    **Proprietary Information And Trade Secrets Retained By Philips**

33.    By virtue of her position at LRN, Philips received both computer software and hard copies of LRN's Confidential Proprietary Information and trade secrets. As of the date of Philips' departure from LRN, and consistently thereafter, LRN has not received any confirmation that Philips has returned all of LRN's trade secrets and Confidential Proprietary Information, despite numerous requests from LRN that Philips confirm that she does not have, and is not using, such information in her new position at a competitor. Such information includes but is not limited to:

    (a)    the confidential client contact information for the General Counsel and other executives of LRN's clients and potential clients;

    (b)    the products and product content that has been specifically customized and tailored for particular customers and particular customer needs, which is protected by copyright laws;

(c) the data containing specific compliance or ethical issues disclosed to LRN by LRN's clients or potential clients, so that LRN could create customized products and solutions for those businesses;

(d) the specific pricing of LRN's products offered to particular clients;

(e) the duration and expiration date of LRN's individual contracts with particular clients;

(f) the "Requests for Proposals" or sales invitations provided to LRN by its clients and prospective clients, including the types of products or services requested;

(g) the salary, commission rates and confidential compensation arrangements between LRN and its sales employees; and

(h) the marketing research, client prospect data, purchasing habits, "best practices" compilations, sales strategies, sales techniques, and other confidential business generation information prepared by LRN.

**G.  Philips Went To Work for LRN's Competitor Midi**

34. On approximately July 8, 2005, LRN learned, for the very first time, that Philips had accepted employment with Midi. LRN also learned that Philips had accepted a position with Midi that required her to perform virtually the same job duties that she previously performed at LRN; namely, the marketing, sale, implementation and development of ethics and compliance products and solutions for Fortune 1000 and mid-size companies.

35. Midi describes itself using language indicating that it is a direct competitor of LRN. On its website, Midi states that it is also a leading provider of "high-impact, ethics and compliance learning solutions." Like LRN, Midi works with several Fortune 1000 and other companies.

36. According to its website, and like LRN, Midi markets itself as a leader in the design and development of effective, interactive compliance and ethics learning solutions. Also like LRN, Midi describes itself as a company that provides software-based training to its clients.

37.     LRN and Midi offer similar products.  These products include software for delivery in various modes, materials for facilitated sessions to be delivered in classrooms, and closely tailored, client-specific products.

38.     LRN and Midi both collaborate directly with their clients to provide materials and services that are based on client-specific needs.

    **H.**     **LRN's Cease And Desist Requests To Philips In Connection With Her Unauthorized And Unlawful Use Of LRN's Trade Secrets And Confidential Proprietary Information.**

39.     Upon learning that Philips had accepted employment with Midi, LRN immediately retained outside legal counsel to enforce its contractual and statutory rights.

40.     On July 13, 2005, LRN's outside legal counsel sent a cease and desist letter to Philips at her home in Washington, D.C., requesting an affirmation that Philips discontinue using LRN's confidential proprietary information and trade secrets.  Specifically, LRN requested an Affidavit from Philips promising that:

    (a)     You cease and desist from all conduct or activities that violate your agreement not to use or disclose LRN's "Confidential Information," as defined and prohibited by the written employment agreement executed between you and LRN;

    (b)     You do not make any use of LRN's trade secrets and/or confidential proprietary information as defined by the Uniform Trade Secrets Act, including its client lists and information on client transactions, contemplated transactions, marketing and pricing information;

    (c)     You immediately stop using LRN's trade secrets and/or confidential proprietary information to solicit its clients, on behalf of yourself or on behalf of any other business entity;

    (d)     You immediately stop using LRN's trade secrets and/or confidential proprietary information to solicit LRN's employees to leave the company;

    (e)     You immediately return to LRN all originals and/or copies of any of its documents, records, computer files, databases, client lists, information or other materials of a confidential or proprietary nature presently in your possession or under your control;

(f) You immediately cease making representations about LRN's business operations, its personnel or employment policies, its client relationships, its client contracts, its client pricing information, its marketing plans and strategies, its projected or historical revenues, its employee turnover, its employee compensation or benefit information, and any of its confidential business practices;

(g) You immediately cease making any negative, untruthful or disparaging remarks about LRN, its business practices, or its treatment of you as an employee or its treatment of any other current or former employee; and

(h) You immediately cease any interference or attempted interference with any business relationship between LRN and any of its clients or employees.

41. On July 18, 2005, LRN's counsel received a response from Philips. In her response, Philips refused to sign the Affidavit requested by LRN.

42. On July 20, 2005, LRN's outside counsel sent another letter to Philips, again requesting that she promise under oath that she would discontinue using LRN's trade secrets and confidential proprietary information.

43. On July 25, 2005, LRN sent another letter to Philips, providing her with a final opportunity to sign the Affidavit previously sent to her by LRN's counsel.

44. On July 28, 2005, LRN's outside counsel received a letter from outside counsel for Philips. In this letter, outside counsel for Philips stated that his client would not sign an Affidavit, as previously requested three times by LRN.

45. On July 30, 2005, LRN's outside counsel contacted outside counsel for Philips to request, for a fourth time, that she sign the Affidavit as requested by LRN. LRN's outside counsel was told that outside counsel for Philips was away from the office until August 8, 2005. When outside counsel for Philips returned, he told LRN's outside counsel that Philips would be unwilling to sign the Affidavit requested by LRN and that there would be no further communication from his client on this issue.

46. Having made numerous attempts to resolve matters without the need to initiate litigation, and having received repeated refusals from Philips in response to LRN's request for an

Affidavit that she discontinue using LRN's trade secrets and confidential proprietary information, LRN determined that it would be forced to file suit in order to protect its statutory and contractual rights.

## COUNT I

### Injunctive Relief

47. The allegations of Paragraphs 1 through 46 are incorporated by reference herein with the same force and effect as if set forth in full below.

48. By virtue of the foregoing, and LRN's Motion for a Preliminary Injunction, LRN has demonstrated a likelihood of success on the merits and that a balancing of the equities favors the issuance of an injunction against Philips.

49. Unless Philips is preliminarily enjoined from misappropriating LRN's trade secrets, LRN will be irreparably harmed by:

    (a) Phillip's disclosure of trade secrets and other confidential information that is solely the property of LRN and its clients;

    (b) Loss of confidentiality of clients' records and dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation; and

    (c) Present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

50. LRN has no adequate remedy at law.

## COUNT III

### Misappropriation of Trade Secrets

**(California Uniform Trade Secrets Act; Cal. Civil Code § 3426, et seq.)**

51. The allegations of Paragraphs 1 through 50 are incorporated herein by reference with the same force and effect as if set forth in full below.

52. LRN's client lists, client preferences, client pricing information, business plans and strategies, marketing plans and strategies, client contracts, past and future business

opportunities, and other confidential and proprietary programs, reports, contracts and proposals are trade secrets of LRN's subject to protection under the California Uniform Trade Secrets Act, Cal. Civil code § 3426, et seq.

53. Any such information obtained by Defendant Philips during the course and in the scope of her employment with LRN is the property of LRN.

54. Such information constitutes protectable trade secrets of LRN.

55. This information derives independent economic value by not being accessible, through proper means, to competitors such as Philips and Midi, who can profit from its use or disclosure.

56. LRN has taken more than reasonable measures under the circumstances to maintain the secrecy of this information, including having Defendant Philips and other employees sign Non-Disclosure Agreements prohibiting use and disclosure of trade secrets and other confidential proprietary information outside of LRN.

57. Defendant Philips has misappropriated or threatens to misappropriate LRN's trade secrets and confidential proprietary information.

58. Since her employment with LRN, Defendant Philips has known that such information is a trade secret.

59. Defendant Philips stands to benefit from her actions in misappropriating or disclosing trade secret information.

60. Defendant Philips knows or has reason to know that she has acquired such information through improper means and/or through breaching her duties under the Non-Disclosure Agreements.

61. Defendant Philips has used or disclosed, or will use and disclose, LRN's trade secret information without LRN's authorization and with knowledge that such use or disclosure was and/or will be unlawful.

62.     As a result, LRN has been damaged in that it has lost, or will lose, its trade secrets and suffered or will suffer loss of customer business, business opportunities, goodwill and economic damages in excess of $75,000, exclusive of interest and costs, and has been disadvantaged in its efforts to serve its current and prospective customers.

## COUNT III

### Breach of Contract

63.     The allegations of Paragraphs 1 through 62 are incorporated by reference herein with the same force and effect as if set forth in full below.

64.     The Non-Disclosure Agreements constitute valid and binding contracts between LRN and Defendant Philips, to which those parties gave their mutual assent for adequate consideration.

65.     LRN satisfactorily performed its obligations under the Non-Disclosure Agreements through the date of Defendant Philips' termination.

66.     Defendant Philips breached her duties under the Non-Disclosure Agreements by misappropriating, or threatening to misappropriate, LRN's confidential proprietary information.

67.     As a result, LRN has been damaged in that it has lost, or will lose, its trade secrets and suffered or will suffer loss of customer business, business opportunities, goodwill and economic damages in excess of $75,000, exclusive of interest and costs, and has been disadvantaged in its efforts to serve its current and prospective customers.

WHEREFORE, by virtue of the foregoing acts complained, LRN respectfully requests the following relief: (1) that Defendant Philips, directly or indirectly, and whether alone or in concert with others, including any officer, agent, employee and/or representative of Defendant's new employer, Midi, be preliminarily and permanently enjoined as follows: (a) from misappropriating, using, or disclosing any of LRN's trade secrets and confidential proprietary information, and that she be specifically required to return all confidential proprietary information in her possession or control to LRN; and (b) from continuing to violate her

- 15 -

obligations under Non-Disclosure Agreements; and (2) for such other and further relief as this Court deems equitable and just.

Dated: August 16, 2005                                   Respectfully submitted,

                                        _____
                                        Roxane Sokolove Marenberg
                                        D.C. Bar No. 390644
                                        Michelle L. Schaefer
                                        *Application for Admission Pending*
                                        DLA Piper Rudnick Gray Cary US LLP
                                        1200 19th Street, N.W.
                                        Washington, DC 20036
                                        202.861.3900 - Telephone
                                        202.223.2085 – Facsimile

                                        Counsel for Plaintiff LRN Corporation