## IN THE UNITED STATE DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LRN CORPORATION          )
          )
        PLAINTIFF,      )
          )
        v.        )      CASE NO.
          )
A. MERRILL PHILIPS      )
          )
        DEFENDANT.     )
_____)

## PLAINTIFF LRN CORPORATION'S
## MEMORANDUM IN SUPPORT OF ITS
## MOTION FOR A PRELIMINARY INJUNCTION

Plaintiff LRN Corporation, formerly known as LRN, The Legal Knowledge Company, ("Plaintiff" or "LRN"), pursuant to Fed. R. Civ. 65(a), respectfully moves this Court to order preliminary injunctive relief preventing Defendant A. Merrill Philips ("Defendant" or "Philips") from misappropriating trade secrets and other confidential and proprietary information acquired by Philips while employed by LRN.  Such actions violate applicable law and various covenants contained in contracts entered into by the parties in December 1999.  The grounds for this motion are as follows:

## I.      INTRODUCTION

Although preliminary injunctive relief is an extraordinary remedy, courts consistently have found it an appropriate remedy when factors such as those present here -- including a strong belief that confidential information is being misused, and a serious threat to the very existence of LRN's business operations — are shown.  In such situations, courts recognize that preliminary injunctive relief is warranted because a trial victory months later will be empty, as irreparable damage to the plaintiff already will have already occurred.

It is critical that this Court issue a preliminary injunction because LRN's trade secrets either have been or will be misappropriated by Philips. Unless immediately restrained, Philips, who is presently employed by one of plaintiff's chief competitors, is in a position to seriously and irreparably damage LRN's business by exploiting its trade secrets.

## A.    LRN's Trade Secrets

The facts, as set forth more fully below, are not in dispute. LRN is in the business of providing outside businesses with corporate governance, ethics and compliance solutions, primarily by the use of computer-based training and education. LRN is and has been operating in a competitive business with other similar companies.

In the regular course of business, LRN develops proprietary business information which, through the devotion of substantial effort and expense, LRN maintains as confidential, in order to protect and enhance its competitive position. This information includes client lists, client preferences, client pricing information, business plans and strategies, marketing plans and strategies, client contracts, past and future business prospects, and other confidential and proprietary programs, reports, contracts and proposals ("Confidential Proprietary Information").

To protect its competitive position, business interests and property rights, and to prevent unfair competition, LRN takes substantial efforts to protect its Confidential Proprietary Information. LRN considers its Confidential Proprietary Information to be trade secrets and, therefore, does not disclose such data to third parties. In fact, LRN requires its employees to sign nondisclosure agreements, and consistently issues written policies containing language regarding the need to protect its Confidential Proprietary Information. LRN further restricts access to its Confidential Proprietary Information to designated employees who are only provided this information on a need-to-know basis, and maintains Confidential Proprietary Information in a secure workplace. LRN does not publish such Confidential Proprietary Information in internal reports of general distribution or on non-secure company computers or in any public disclosures on the Internet or in trade journals.

- 2 -

### B.    Philips' Access To LRN's Trade Secrets

Philips began working for LRN in December 1999, as a Regional Director of Customer Relations and was responsible for confidential sales relationships with clients.  As a result of her position, Philips had access to LRN's Confidential Proprietary Information including client contracts for LRN's products and services; client pricing information; client-specific customized programs and seminars; research and development materials used to create programs, seminars and proposals; the duration of client-specific contracts; renewal terms of such contracts; and information about products and services that LRN clients used in the past or information about clients' needs in the future or information about the products or services that clients have rejected.  Philips used such information to forge relationships with LRN clients and prospective clients, and to sell LRN's products and services.

At the inception of Philip's employment with LRN, and in order to protect LRN's Confidential Proprietary Information, LRN had Philips sign two Non-Disclosure Agreements prohibiting the improper use of LRN's Confidential Proprietary Information.

### C.    Philips' Resignation From LRN

Philips resigned her employment with LRN in February 2005.  At the time of her resignation, Philips never acknowledged or informed LRN that she intended to work for a competitor.  When asked to reaffirm her promise to maintain all of LRN's Confidential Proprietary Information in absolute secrecy, Philips refused to sign an Intellectual Property and Confidentiality Employee Confirmation.  Also, Philips has flatly refused to acknowledge under oath that she is not using or disclosing LRN's Confidential Proprietary Information.

### D.    Philips' Employment With A Competitor And Her Continued Possession Of LRN's Confidential Proprietary Information

LRN discovered that Philips was working for Midi Corp ("Midi"), a direct competitor of LRN's, in July 2005 after a Midi employee attempted to recruit an LRN employee and informed the LRN employee that Philips was working for Midi.  LRN immediately contacted Philips to

reminder her of her obligations under the Non-Disclosure Agreements she had signed. LRN demanded that Philips cease and desist from any improper activity and requested that she sign an Affidavit attesting to her non-disclosure of LRN's Confidential Proprietary Information. Philips refused to do so, despite LRN's continuous efforts to obtain her attestation. After giving Philips four opportunities to sign the Affidavit, LRN determined that further efforts would be futile and instituted the current action.

LRN's Confidential Proprietary Information obtained by Philips is invaluable and, in Philips' hands, could inflict serious damage to LRN's business operations and its future business possibilities. Through the use of LRN's Confidential Proprietary Information, Philips will be able to take unfair advantage of this information in seeking to acquire clients. Indeed, in some instances, LRN may not be able to recover its investment in its strategic planning and business research after Philips uses its Confidential Proprietary Information, and it will suffer substantial financial losses.

The facts that (a) Philips refused to sign the Intellectual Property and Confidentiality Employee Confirmation upon her termination of employment with LRN; (b) failed to disclose that she was going to work for a competitor; (c) failed to acknowledge her return of all of the Confidential Proprietary Information she had in her possession, and (d) failed to sign an Affidavit, all lead to one inescapable conclusion: Philips has been using and will continue to use LRN's trade secrets and Confidential Proprietary Information, in contravention of her contractual obligations and statutory law.

## II.     STATEMENT OF FACTS

### A.     The Services LRN Provides Its Clients

1.     LRN provides outside businesses with corporate governance, ethics and compliance solutions to help them develop the knowledge, education and operational solutions to address legal, compliance and ethical issues. Affidavit of Julie Molleston ("Molleston Aff."), ¶ 4, attached as Ex. 1.

2.      LRN creates and markets products that combine legal knowledge, technology and hands-on expertise in the areas of complex governance and compliance management in order to assist its clients.  The products offered by LRN are primarily distributed through specially designed software provided to LRN's clients, and in written course materials.  LRN regularly copyrights its products and courses, in order to avoid unauthorized or unlawful use by a competitor.  Molleston Aff. ¶¶ 6-7.

3.      LRN offers its clients software products for delivery in multiple modes, including online access, scaling to any bandwidth requirement.  LRN also provides its clients with materials for facilitated sessions to be delivered in classrooms.  Molleston Aff. ¶ 10.

4.      In order to serve the particular needs of its clients, LRN regularly receives highly confidential and sensitive information.  LRN collaborates directly with its clients so that it can tailor the compliance and ethics learning materials to the specific needs of its clients.  LRN has the capacity, for example, to provide materials that are customized to particular needs in multiple languages and localized to address local laws, culture or customs.  Molleston Aff. ¶ 11.

**B.     LRN's Efforts To Maintain The Secrecy Of Its Confidential Proprietary Information And Its Trade Secrets**

5.      LRN takes serious and strong efforts to protect its secrets and Confidential Proprietary Information.  It seeks to maintain the secrecy of such information by storing the data on company computers that are password protected and on password protected websites.  The passwords to such information are provided only to those personnel with a need to have access to such information in order to meet client service requirements.  Molleston Aff. ¶ 13.

6.      At the outset of employment, LRN requires each of its employees to agree to maintain the secrecy of LRN's trade secrets and Confidential Proprietary Information, as well as the secrecy of the information provided to LRN by its clients.  In its written policies and procedures, LRN consistently reminds its employees of the need to protect the company's trade secrets and confidential proprietary information.  Molleston Aff. ¶ 14.

7.    In addition, LRN requires its employees to execute written non-disclosure agreements, as an irrevocable condition of employment.  Such non-disclosure agreements set forth the confidential and proprietary nature of the information used to serve LRN's clients, as well as LRN's business interest in protecting such information.  The agreements also prohibit employees from misappropriating its Confidential Proprietary Information and trade secrets. Molleston Aff.  ¶¶15-21.

**C.    Philips Worked For LRN And Signed Two Non-Disclosure Agreements**

i.    The First Non-Disclosure Agreement

9.    Philips was an employee of LRN.  She signed the first Non-Disclosure Agreement at the inception of her employment on December 9, 1999.  Molleston Aff. ¶ 23.

10.    The Non-Disclosure Agreement provided that:

(a)    LRN is engaged in the worldwide business of creating, managing and disseminating legal knowledge in such forms including, but not limited to, legal research and analysis, legal compliance and education, and knowledge management and knowledge management systems (the "Business");

(b)    LRN possesses significant technical know-how, sales know-how, trade secrets, and other confidential information (as defined below) that it has developed and will continue to develop, and which information is and will be proprietary to it and an exceedingly valuable asset;

(c)    my relationship with LRN has given me, and will continue to give me, access to and possession of such know-how, trade secrets and other Confidential Information;

(d)    LRN has a legitimate business interest in protecting the confidentiality of such know-how, trade secrets and other Confidential Information;

(e)    LRN is a pioneer in business of creating, managing, and disseminating legal knowledge and has developed, and will continue to develop significant goodwill, including but not limited to significant relationships and contacts with current and former customers and prospective customers; and

(f)    LRN has a legitimate business interest in protecting its goodwill from competition on my part to the extent provided below.

Molleston Aff. ¶ 15; *see also* Ex. A to Molleston Aff.

11. The Non-Disclosure Agreement also provided that:

    (a) I will not (except as necessary to perform specific employment duties with LRN as directed by LRN), while in employ of LRN or thereafter, communicate or divulge to, or use for the benefit of myself or any other person, firm, association, or corporation, any Confidential Information. All records, files, memoranda, reports, price lists, customer lists, drawings, plans, sketches, documents, equipment, and the like, relating to the business of LRN or to any Confidential Information which I may use or prepare or come into contact with, shall remain the sole property of LRN, and I will return all such items to LRN immediately upon LRN's request, or immediately upon termination of my employment with LRN with or without such request.

    (b) For purposes of this agreement, "Confidential Information" includes any information concerning: any inventions; discoveries; improvements; processes; formulas; apparatus; equipment; methods; trade secrets; research; secret data; technical know-how; computer files and programs; sales know-how; jobs know-how; customer lists; the identity of any customers; customers, including but not limited to the identity of any products or services furnished to specific customers, and the nature of any customer preferences or other special requirements imposed by particular customers; prices, including but not limited to pricing methods, pricing formulas, margins, discounts, concessions, and adjustments; costs, including but not limited to researcher fees and any methods and formulas used in setting researcher fees; or any other confidential matters or information possessed, owned, or used by LRN that may be communicated to, acquired by, or learned by me in the course of or as a result of my employment with LRN or otherwise.

Molleston Aff. ¶ 16; *see also* Ex. A to Molleston Aff.

12. Furthermore, the Non-Disclosure Agreement required that all LRN employees explicitly refrain from doing business with a competitor in a way that would disclose or potentially disclose LRN's trade secrets or Confidential Proprietary Information. Molleston Aff. ¶ 17; see also Ex. A to Molleston Aff.

## 1.     The Second Non-Disclosure Agreement

13.     Philips also signed a separate Non-Disclosure Agreement on December 2, 1999.

Molleston Aff. ¶ 23.  The second Non-Disclosure Agreement defined LRN's trade secrets and

Confidential Proprietary Information as follows:

> "Information" shall include all information relating to LRN, including but not limited to, its business, customers, personnel, independent contractors, researchers, financial condition, plans, products, intellectual property, analysis, projects, processes, systems, marketing, research or development activities, and all technical or scientific information or know-how of LRN or of any other person or entity as to which LRN is obligated to maintain its confidence, which is disclosed to Receiver [the LRN employee] either orally, or in diagram, electronic, digital, written or other recorded form that is not:
>
> (a)     already known to Receiver prior to the date of this Agreement or independently developed by Receiver after the date hereof;
>
> (b)     already publicly available or that becomes publicly available other than through a breach of this Agreement by Receiver; or
>
> (c)     rightfully received by Receiver from a third party without similar restriction from such party and the disclosure of which, by such third party does not constitute a violation of an obligation by such third party to LRN; or
>
> (d)     required to be disclosed pursuant to subpoena or other judicial process.

Molleston Aff. ¶ 19; *see also* Ex. B to Molleston Aff.

14.     The second Non-Disclosure Agreement further provided, in pertinent part:

> Receiver will hold in confidence the Information and will not, without the prior consent of LRN, either directly or indirectly:
>
> (a)     make or use, for Receiver's own benefit or otherwise, any portion of the Information, including but not limited to any commercial use thereof; or
>
> (b)     duplicate, disseminate, disclose or transfer any portion of the material or media on which the Information is presented to any other person, governmental agency, firm, business, or other entity.

Molleston Aff. ¶ 20; *see also* Ex. B to Molleston Aff.

### 2. Both Non-Disclosure Agreements Provided for Injunctive Relief

15.    Both Non-Disclosure Agreements provided that LRN would be entitled to injunctive relief for violations of the Non-Disclosure Agreements.  Molleston Aff. ¶¶ 18, 21; see also Ex. A and B to Molleston Aff.

16.    Both Non-Disclosure Agreements also explicitly provided that they would be governed by California law.  Molleston Aff. ¶ 22; see also Ex. A and B to Molleston Aff.

### D. Philips' Prior Employment With LRN

17.    Philips began her employment with LRN as Regional Director, Customer Relations.  Molleston Aff. ¶ 24.

18.    LRN made a significant investment in Philips' training and development at the company.  Molleston Aff. ¶ 25.

19.    Philips was assigned increasing responsibilities to sell LRN's products to current and potential customers.  Philips was responsible for maintaining daily sales activity calls to support a sales pipeline at a level required to achieve her sales target.  Philips also was responsible for ensuring that new customer acquisition targets were met and that existing customer relationships were managed and expanded.  Molleston Aff. ¶ 26.

20.    As Philips continued her employment at LRN, she was responsible for executing effective prospecting techniques to help her schedule appointments with General Counsel and other executives of clients and prospective clients.  Philips routinely received confidential client contact and prospecting information from LRN, which was developed at LRN's expense for her use in sales presentations.  Molleston Aff. ¶ 27.

21.    In addition, LRN provided Philips with confidential information to develop, deploy and share "best practices" relative to sales presentations and proposals.  This information was provided so that it could be applied to the specific needs of LRN's clients, in order to customize LRN's message, as required.  Molleston Aff. ¶ 28.

- 9 -

22.    Throughout her employment, LRN furnished Philips with updated data so that she could work closely with current prospective customers to ensure that they gain full value from their investment with LRN, and to ensure that LRN's clients and prospective clients kept abreast of current LRN products and services, so that she could increase the number of products and services purchased.  Molleston Aff. ¶ 29.

23.    Philips successfully used the data provided by LRN to forge significant client relationships.   During her employment with LRN, Philips was able to use LRN's internal resources to gain access to executives at several Fortune 1000 and other companies to make sales presentations.  When Philips successfully completed a sale, the typical fees paid by the client to LRN amounted to several thousand dollars for each product or services purchased.   Philips received commissions based on these sales.  Molleston Aff. ¶ 30.

**E.    Philip's Resignation From LRN**

24.    Philips resigned her employment with LRN, effective February 4, 2005.  At the time of her resignation, Philips did not disclose that she intended to work for Midi, or any of LRN's competitors.  Molleston Aff. ¶ 31.

25.    At the time of Philips' resignation, Philips stated that she would not sign an Intellectual Property and Confidentiality Employee Confirmation (the "Confirmation"). Molleston Aff. ¶ 32.

26.    The Confirmation provided, in pertinent part, as follows:

> LRN takes the protection of its intellectual property and confidential information very seriously.   When you joined LRN you committed to help protect this information.   We and our customers and partners appreciate your continuing efforts.  Your responsibilities in this regard continue after your employment here.

Molleston Aff. ¶ 33; *see also* Ex. C to Molleston Aff.

27.    The Confirmation further provided as follows:

> You have agreed to maintain all of LRN and LRN's customers' confidential information in absolute secrecy.  You should not take any materials containing confidential information with you.  You may not directly or indirectly share or allow access to this information.

Molleston Aff. ¶ 34; *see also* Ex. C to Molleston Aff.

F.    **Proprietary Information And Trade Secrets Retained By Philips**

28.    By virtue of her employment at LRN, Philips received both computer software and hard copies of LRN's Confidential Proprietary Information and trade secrets.  As of the date of Philips' departure from LRN, and consistently thereafter, LRN has not received any confirmation that Philips has returned all of LRN's trade secrets and Confidential Proprietary Information, despite numerous requests from LRN that Philips confirm that she does not have, and is not using, such information in her new position at a competitor.  Such information includes, but is not limited to:

(a)    the confidential client contact information for the General Counsel and other executives of LRN's clients and potential clients;

(b)    the products and product content that has been specifically customized and tailored for particular customers and particular customer needs, which is protected by copyright laws;

(c)    the data containing specific compliance or ethical issues disclosed to LRN by LRN's clients or potential clients, so that LRN could create customized products and solutions for those businesses;

(d)    the specific pricing of LRN's products offered to particular clients;

(e)    the duration and expiration date of LRN's individual contracts with particular clients;

(f)    the "Requests for Proposals" or sales invitations provided to LRN by its clients and prospective clients, including the types of products or services requested;

(g)    the salary, commission rates and confidential compensation arrangements between LRN and its sales employees; and

(h)    the marketing research, client prospect data, purchasing habits, "best practices" compilations, sales strategies, sales techniques, and other confidential business generation information prepared by LRN.

Molleston Aff. ¶ 35.

**G.      Philips Went To Work for LRN's Competitor Midi**

29.      On approximately July 8, 2005, LRN learned, for the very first time, that Philips had accepted employment with Midi.  LRN also learned that Philips had accepted a position with Midi that required her to perform virtually the same job duties that she previously performed at LRN; namely, the marketing, sale, implementation and development of ethics and compliance products and solutions for Fortune 1000 and mid-size companies.  Molleston Aff. ¶ 47.

30.      Midi describes itself using language indicating that it is a direct competitor of LRN.  On its website, Midi states that it is also a leading provider of "high-impact, ethics and compliance learning solutions."  Like LRN, Midi works with several Fortune 1000 and other companies.  Molleston Aff. ¶ 8.

31.      According to its website, and like LRN, Midi markets itself as a leader in the design and development of effective, interactive compliance and ethics learning solutions.  Also like LRN, Midi describes itself as a company that provides software-based training to its clients.  Molleston Aff. ¶ 9.

32.      LRN and Midi offer similar products.  These products include software for delivery in various modes, materials for facilitated sessions to be delivered in classrooms, and closely tailored, client-specific products.  Molleston Aff. ¶¶ 10-11.

33.      LRN and Midi both collaborate directly with their clients to provide materials and services that are based on client-specific needs.  Molleston Aff. ¶¶ 11-12.

**H.      LRN's Cease And Desist Requests To Philips In Connection With The Unauthorized And Unlawful Use Of LRN's Trade Secrets And Confidential Proprietary Information**

34.      Upon learning that Philips had accepted employment with Midi, LRN immediately retained outside legal counsel to enforce its contractual and statutory rights.

35.      On July 13, 2005, LRN's outside legal counsel sent a cease and desist letter to Philips at her home in Washington, D.C., requesting an affirmation that Philips discontinue using

- 12 -

LRN's Confidential Proprietary Information and trade secrets.  Specifically, LRN requested an Affidavit from Philips promising that:

(a)    You cease and desist from all conduct or activities that violate your agreement not to use or disclose LRN's "Confidential Information," as defined and prohibited by the written employment agreement executed between you and LRN;

(b)    You do not make any use of LRN's trade secrets and/or confidential proprietary information as defined by the Uniform Trade Secrets Act, including its client lists and information on client transactions, contemplated transactions, marketing and pricing information;

(c)    You immediately stop using LRN's trade secrets and/or confidential proprietary information to solicit its clients, on behalf of yourself or on behalf of any other business entity;

(d)    You immediately stop using LRN's trade secrets and/or confidential proprietary information to solicit LRN's employees to leave the company;

(e)    You immediately return to LRN all originals and/or copies of any of its documents, records, computer files, databases, client lists, information or other materials of a confidential or proprietary nature presently in your possession or under your control;

(f)    You immediately cease making representations about LRN's business operations, its personnel or employment policies, its client relationships, its client contracts, its client pricing information, its marketing plans and strategies, its projected or historical revenues, its employee turnover, its employee compensation or benefit information, and any of its confidential business practices;

(g)    You immediately cease making any negative, untruthful or disparaging remarks about LRN, its business practices, or its treatment of you as an employee or its treatment of any other current or former employee; and

(h)    You immediately cease any interference or attempted interference with any business relationship between LRN and any of its clients or employees.

Molleston Aff. ¶¶ 47-49; *see also* Ex. F to Molleston Aff.

- 13 -

36.    On July 18, 2005, LRN's counsel received a response from Philips.  In her response, Philips refused to sign the Affidavit requested by LRN.  Molleston Aff. ¶ 51; see also Ex. H to Molleston Aff.

37.    On July 20, 2005, LRN's outside counsel sent another letter to Philips, again requesting that she promise under oath that she would discontinue using LRN's trade secrets and Confidential Proprietary Information.  Molleston Aff. ¶ 53; see also Ex. J to Molleston Aff.

38.    On July 25, 2005, LRN sent another letter to Philips, providing her with a final opportunity to sign the Affidavit previously sent to her by LRN's counsel.  Molleston Aff. ¶ 55; see also Ex. L to Molleston Aff.

39.    On July 28, 2005, LRN's outside counsel received a letter from outside counsel for Philips.  In this letter, outside counsel for Philips stated that his client would not sign an Affidavit, as previously requested three times by LRN.  Molleston Aff. ¶ 57; see also Ex. N to Molleston Aff.

40.    On July 30, 2005, LRN's outside counsel contacted outside counsel for Philips to request, for a fourth time, that she sign the Affidavit as requested by LRN.  LRN's outside counsel was told that outside counsel for Philips was away from the office until August 8, 2005.  When outside counsel for Philips returned, he told LRN's outside counsel that Philips would be unwilling to sign the Affidavit requested by LRN and that there would be no further communication from his client on this issue.  Molleston Aff. ¶ 58.

41.    Having made numerous attempts to resolve matters without the need to initiate litigation, and having received repeated refusals from Philips in response to LRN's request for an Affidavit that she discontinue using LRN's trade secrets and Confidential Proprietary Information, LRN determined that it would be forced to file suit in order to protect its statutory and contractual rights.  Molleston Aff. ¶ 59..

### III.    <u>ARGUMENT</u>

**A.    LRN Is Entitled To The Requested Preliminary Injunctive Relief**

A court may issue a preliminary injunction when the movant demonstrates that: (1) there is substantial likelihood that the plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will not substantially injure the other party; and (4) the public interest will be furthered by an injunction. *Morgan Stanley v. Rothe*, 150 F.Supp.2d. 67, 72 (D.D.C. 2001) (relying upon *Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998). These four factors are considered in conjunction with one another, and no one factor is necessarily dispositive as to whether injunctive relief is appropriate. *CityFed Fin. Corp. v. Officer of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995). The factors must be balanced against each other, and a particularly strong showing on one factor may compensate for a weak showing on one or more of the other factors. *Morgan Stanley v. Rothe*, 150 F.Supp.2d. 67 at 72.

Here, preliminary injunctive relief is warranted because the facts demonstrate both: (1) a strong likelihood that LRN will prevail at trial; and (2) that LRN will suffer severe and irreparable harm absent the issuance of an order restraining Philips from continuing to unlawfully engage in unfair competition through the misappropriation of LRN's trade secrets and other Confidential Proprietary Information.

As set forth below, the hardship balance greatly tilts in favor of LRN. LRN will be irreparably injured if injunctive relief does not issue, in that Philips is in a position to seriously and irreparably damage LRN's business by exploiting its trade secrets and Confidential Proprietary Information. Of course, LRN never anticipated these potentially drastic consequences. To the contrary, as shown herein, LRN took all available and reasonable steps to prevent the conduct that is subject of its request for injunctive relief.

On the other hand, Philips will not be faced with any surprising or unintended consequences, if injunctive relief is granted. This is because Philips expressly, and

~WASH1:4724662.v1

unequivocally, agreed to such injunctive relief when she signed two separate non-disclosure agreements, at the outset of her employment with LRN.

Moreover, even if the Court were to find that the probability of irreparable injury to LRN is not great, LRN demonstrates that it is likely to succeed on the merits of its underlying claims. Finally, it is plain that the granting of a preliminary injunction will simply uphold the terms already agreed upon by the parties in their Agreements, thereby reinforcing the value of legal contracts. Such relief is, therefore, in the public interest.

### B.    The Balance Of Harm Weighs In Favor Of LRN

#### 1.    Irreparable Harm Will Result From Philip's Use Of LRN's Trade Secrets And Confidential Proprietary Information

Preliminary injunctive relief is an appropriate initial remedy because of the harm that will ensue without it. While a company faces competition for its customers in the normal course, the facts in this case make clear that LRN is facing an unlawful and unfair challenge in this case. Here, Philips has intimate knowledge of LRN's business, all due to LRN's significant investment in Philip's training and development. Equipped with this information, Philips is in a position where she has, or threatens to, misappropriate LRN's Confidential Proprietary Information for the benefit of herself and LRN's competitor Midi, a company engaged in the same business as LRN. Importantly, Midi and LRN compete for the same types of clients all over the world and provide the same services to these clients.

Philips has access to and application of information, such as client lists; client preferences; client pricing information; business plans and strategies; client contacts; past and future business opportunities; research and development materials used to create client programs, seminars and proposals; the duration of client-specific contracts; renewal terms of client contracts; information about products and services that LRN clients used in the past, or are interested in using in the future; "best practices" data indicating the general business practices of

- 16 -

clients with respect to a particular topic or issue, and confidential software programs and databases.

Based on Philips' possession, disclosure and use of this information, LRN may be forced to spend significant resources and expend substantial efforts to make sure that Philips does not take unfair advantage of the knowledge that Philips has acquired while at LRN. Additionally, equipped with information such as client-specific needs, prospective client-specific needs, the duration of certain contracts, and the cost structure of the services and products that LRN provides, Philips is in a position to use LRN's Confidential Proprietary Information to attempt to solicit LRN's clients and prospective clients away from LRN. As a result, LRN will suffer irreparable harm from the loss of this business and the potential concomitant loss of customer trust and good will. LRN's clients expect the private and sensitive information it discloses to LRN to be known only to themselves and to LRN, and any use of this information outside of LRN is unauthorized. *Morgan Stanley v. Rothe,* 150 F.Supp. 2d at 76-80 (employer demonstrated adequate irreparable harm by showing it faced loss of its customers and possibility of permanently damaged relationships with its customers through loss of confidentiality of their records).

The financial losses from Philips' wrongful conduct are difficult, if not impossible, to measure precisely. It is impossible at this time to determine the number of LRN clients or prospective clients who may be improperly solicited by Philips, or the changes that LRN will need to make to the services and products it offers. What is certain is that Philips must not be allowed to profit from her improper behavior. LRN is entitled to protection of its confidential methods of business operations and contract rights. LRN also is entitled to protect its business reputation and goodwill.

Philips explicitly agreed not to improperly use LRN's Confidential and Proprietary Information and signed two agreements to that effect. Indeed, by signing both agreements she acknowledged that LRN would be entitled to injunctive relief for violation of the contracts

because such breaches would cause irreparable harm not compensable through monetary damages.  Exs. A and B to Molleston Aff.

Courts traditionally uphold such contractual provisions, as there can be no argument by the defense that the plaintiff's confidential information is not jeopardized by the defendant's conduct.  *Morgan Stanley v. Rothe*, 150 F.Supp. 2d. at 76 (court granted injunctive relief where employment contract contained injunctive relief provision); *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38 (4th Cir. 1999) (finding irreparable harm, in part because "[defendant] acknowledged in his Employment Agreement that a breach of the confidentiality clause would cause 'irreparable injury' to [the plaintiff company]") (*citing, Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) (relying on a similar clause in determining irreparable injury for purposes of upholding a grant of injunctive relief)).  *See also, Allegheny Energy v. DQE, Inc.*, 171 F.3d 153, 165 (3rd Cir. 1999) ("[i]t may be sufficient, for purposes of the irreparable harm inquiry, that there is a contractual provision permitting specific performance."); *True North Communications, Inc. v. Publicis*, 711 A.2d 34, 44 (Del. Ch.) ("[t]he irreparable harm element of the injunction is established by [defendant's] own contractual obligation in . . . the Pooling Agreement."), *aff'd*, 705 A.2d 244 (Del. 1997); *Vitalink Pharmacy Services, Inc. v. GranCare, Inc.*, 1997 WL 458494, *9 (Del. Ch. Aug. 7, 1997) ("[The element of irreparable harm] is established by [defendant's] own contractual stipulation in the … Agreement . . . . That alone suffices to establish the element of irreparable harm, and [defendant] cannot be heard to contend otherwise.").

Even without a contractual provision, courts regularly find preliminary injunctive relief appropriate when confidential information and/or trade secrets of a business are in danger of misuse by a competitor.  *See*, *e.g.*, *Ancora Capital and Management Group v. Gray*, 2003 WL 23426 (4th Cir. Jan. 3, 2003) (reversing district court's denial of preliminary injunction, where district court had assumed a sufficient showing that the defendant disclosed trade secrets yet denied injunctive relief).  As the Second Circuit has aptly stated, "a trade secret once lost is, of

- 18 -

course, lost forever" and, as a result, such a loss "cannot be measured in money damages." *North Atlantic*, 188 F.3d at 49 (*quoting FMC Corp. v. Taiwan Tainan Giant Indus. Co, Ltd.*, 730 F.2d 61, 63 (2d Cir. 1984)).

The difficulty in determining precise monetary losses after the damage has been done also weighs in favor of granting preliminary injunctive relief. *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994) (holding that "generally irreparable injury is suffered when monetary damages are difficult to ascertain or inadequate"); *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) ("[H]arm to goodwill, like harm to reputation, is the type of harm not readily measurable or fully compensable in damages – and for that reason, more likely to be found 'irreparable'").

### 2.     Philips Will Suffer No (Or Slight) Harm If Enjoined

In contrast, Philips will suffer slight or no harm if she is preliminarily enjoined from improperly using LRN's Confidential Proprietary Information. Indeed, Philips will be precisely in the same position that she bargained for, as the Court's order will only require Philips to obey applicable laws and abide by the terms of the Agreements she voluntarily entered into in exchange for considerable financial benefits and offers of employment. In short, Philips will merely be required to adhere to the terms of the Non-Disclosure Agreements that she voluntarily and knowingly entered into with LRN. LRN relied on Philips' obligations to abide by the terms of the written agreements she signed, and did not expect that Philips would breach those agreements.

Moreover, any possible claim of harm is undermined by Philips' own repeated refusals to participate in less formal relief; namely, (1) refusal to sign the Confirmation; (2) failure to disclose to LRN that she would be working for a competitor; (3) failure to return all of LRN's Confidential and Proprietary Information; and (4) refusal to sign an Affidavit.

- 19 -

**C.**    **LRN Likely Will Prevail On The Merits**

    **1.**    **Violation Of Cal. Civ. Code § 3426 et seq. ("CUTSA")**

Under CUTSA, misappropriation is defined as "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired through improper means." Cal. Civ. Code § 3426.1. It is also described as "disclosure or use of a trade secret of another without express or implied consent by a person who … at the time of disclosure knew or had reason to know that his or her knowledge of the trade secret was … acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or … derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use. *Id.* Actual or threatened misappropriation may be enjoined. Cal. Civ. Code § 3426.2; *see also Richardson v. Suzuki Motor Co. Ltd.,* 868 F.2d 1226, 1247 (Fed. Cir. 1989) ("[A] misappropriator of trade secrets has no authorization of right to continue to reap the benefits of its wrongful acts."); *ABBA Rubber Co. v. Seaquist*, 235 Cal. App. 3d 1 (1919) (holding that actual or threatened misappropriation of trade secrets may be enjoined).

The UTSA defines a trade secret as information including a pattern, device, method, technique, or process, that: (1) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Cal. Civ. Code § 3426.1(d); *see also Greenly v. Cooper*, 77 Cal. App. 3d 382 (1978) ([a list of customers] built up by ingenuity, time, labor and expense of the owner over a period of many years is property of the employer and knowledge of such list acquired by an employee by reason of his employment, may not be used by the employee as his own property or to his employer's prejudice); *Morlife, Inc. v. Perry,* 56 Cal. App. 4th 1514, 1521 (1997) (employer's information regarding customers was a trade secret where customers had been discovered with great efforts and expenditures and where customer information was stored on computer with restricted access); *Corporate Express Office Prods., Inc. v. Martinez*, No. CV-

SA02-87, 2002 WL 31961458, *4 (C.D. Cal. 2002) (preliminary injunction granted where information was found to have economic value because access to such information would allow competitor to target certain businesses without having to incur the of obtaining that information on its own); *Fleming v. Ray-Suzuki, Inc.,* 225 Cal. App. 3d 574, 576 (1990) (marketing plans were deserving of protection); *MAI Sys. Corp v. Peak Computers, Inc.,* 991 F.2d 511, 522 (9th Cir. 1993) (computer program held to be a trade secret).

Philips is intimately familiar with information that qualifies as LRN's trade secrets. LRN invested substantial time, manpower and money to conduct relevant market research, synthesize the research, obtain client specific details, and prospective client-specific details, all in order to customize products and services to meet the specific needs of current and potential clients. This information derives independent economic value from not being generally known to the public or to competitors.

Indeed, LRN ensures the secrecy of this information by limiting access to it and requiring employees to sign non-disclosure agreements. Philips' possession of LRN's Confidential Proprietary Information was acquired while employed by LRN and any use thereof would be in contravention of her duties to LRN under the Non-Disclosure Agreements she signed. Philips' refusal to sign any legal documents in which she swears not to improperly use LRN's Confidential Proprietary Information lead to the inevitable conclusion that she is using and will continue to use this information for the benefit of herself and to the irreparable detriment of LRN. Thus, LRN is entitled to injunctive relief against Philips because its Confidential Proprietary Information clearly qualifies as a protectable trade secrets under the UTSA.

*Courtesy Temporary Service, Inc. v. Camacho*, 222 Cal. App. 3d 1278 (1990) is dispositive of this issue. There, the plaintiff was in the temporary employment business, providing temporary workers to various companies according to their specific needs. *Id*. at 1282. In the course of its dealings with clients, the defendant became knowledgeable and experienced in its clients' operations and developed sophisticated customer information such as the key

contacts within the clients' business, special needs and client characteristics. In reversing the trial court's denial of injunctive relief, the *Courtesy* Court stated that the "[plaintiff] customer list and related information was the product of a substantial amount of time, expense, and effort," clearly falling within the two prong definition of a protectable "trade secret" under the UTSA. *Id.* at 1286-1291. As the Court explained, the customer lists were (1) the product of a substantial amount of time, expense and effort on the part of the plaintiff; (2) not readily ascertainable to other competitors, and (3); the subject of reasonable efforts to maintain their confidentiality. *Id.* As a result, the court concluded that the trial court's refusal to grant injunctive relief for the misappropriation of the plaintiff's trade secrets was an abuse of discretion. *Id.* at 1291.

For similar reasons, other California courts have regularly enjoined employees' attempts to misappropriate their employers' trade secrets. *See Rigging Int'l Maint. Co. v. Gwin*, 128 Cal. App. 3d 594, 607 (1982) (where an employee is in possession of secret information not readily accessible to others and acquired by reason of his employment, then courts will afford injunctive relief.); *Southern California Disinfecting Co. v. Lomkin*, 183 Cal. App. 2d 431, 433 (1960) ("This case is not the usual commercial hijacking of a former employee but rather it is trade secret larceny."); *Reiss v. Sanford*, 47 Cal. App. 2d 244, 246, 247 (1941) ("the accepted doctrine [is] that no agent or employee having been entrusted in the course of his employment with secret and valuable information known only to his employer may thereafter utilize this secret knowledge against the interests or to the prejudice of his employer … and it is well settled that a court of equity will restrain any threatened disclosure or use"); a*ccord, Winston Research Corp. v. Minnesota Min. & Mfg. Co.*, 350 F.2d 134 (9th Cir. 1965) ("denial of any injunction would at all would leave the faithless employee unpunished where, as here … he and his new employer would retain the benefit of a head start over legitimate competitors who did not have access to the trade secrets").

The facts in this case more than sustain LRN's request for injunctive relief. To prevail, LRN need not prove that Philips has, to date, actually used LRN's trade secrets and Confidential

~WASH1:4724662.v1

Proprietary Information.  Cal. Civ. Code § 3426(a).  Yet here, Philips has misappropriated, or threatens to misappropriate, LRN's Confidential Proprietary Information.  To come to any other conclusion is to ignore the facts that Philips refused to sign the Intellectual Property and Confidential Employee, refused to sign an Affidavit swearing that she would not improperly use LRN's trade secrets, failed to inform LRN that she would be working for a competitor, and retained LRN's Confidential and Proprietary Information.

### 2.    Breach of Contract

A plaintiff must establish the following elements in a cause of action for breach of contract; (a) the existence of a contract; (b) plaintiff's performance or excuse for nonperformance; (c) defendant's breach, and d) the resulting damages to plaintiff.  *Careau & Co. v. Security Pacific Business Credit, Inc.*, 222 Cal App. 3d 1371, 1388 (1990).

In the case at hand, Philips entered into two Non-Disclosure Agreements with LRN. Ex. 1 and 2 to Molleston Aff.  By signing these agreements she acknowledged that LRN possesses trade secrets, that she would have access to these trade secrets while performing her job duties, and that she would not misappropriate the trade secrets while employed by LRN or thereafter.  The agreements provided in pertinent part:

- "I will not … while in the employ of LRN or thereafter, communicate or divulge to, or use for the benefit of myself or any other person, firm, association or corporation, any Confidential Information.";

- "[I] will not … directly or indirectly … make or use … any portion of the [Confidential] Information, including but not limited to any commercial use … [or] duplicate, disseminate, disclose or transfer any portion of material … to any other person, government agency, firm, business, or other entity."; and

- "All … Confidential Information which I may use or prepare or come into contact with, shall remain in the sole property of LRN, and I will return all such items to LRN immediately upon termination of my employment with LRN."

Ex. 1 and 2 to Molleston Aff.

- 23 -

Despite these affirmations, Philips' actions lead LRN to conclude that she is violating the agreements she entered into with LRN. Why else would she not sign the Confirmation, not disclose that she would be working for Midi, not sign the Affidavit, and not return the confidential information in her possession?

As discussed above, Philips' breach of the Agreements result in irreparable harm to LRN. LRN's likelihood of success on its breach of contract claim is enough, in itself, to warrant this Court's granting of injunctive relief, relief contemplated by the agreements that Philips executed.

## IV.    CONCLUSION

For all the foregoing reasons, this Court should order the requested temporary and preliminary injunctive relief, and no bond should be required.

Dated:  August 16, 2005                    Respectfully submitted,

_____
Roxane Sokolove Marenberg
D.C. Bar No. 390644
Michelle L. Schaefer
Application for Admission Pending
DLA Piper Rudnick Gray Cary US LLP
1200 Nineteenth Street, N.W.
Washington, DC 20036
202.861.3900 - Telephone
202.223.2085 - Facsimile

Counsel for Plaintiff LRN Corporation

- 24 -

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Motion for Preliminary Injunction, accompanying Memorandum in Support, and Notice of Hearing were served in conjunction with service of LRN's Complaint for Injunctive Relief upon:

A. Merrill Philips
3303 Water Street, N.W.
Apt. 3N
Washington, DC 20007

_____

Gail Brosious