# EXHIBIT 1

# DECLARATION OF JULIE MOLLESTON

I, Julie Molleston, declare and state as follows:

1.     I have personal knowledge of the facts contained in this declaration and, if called as a witness, could and would testify as to their accuracy.

2.     I am Senior Director of Human Resources for LRN Corporation, formerly known as LRN, The Legal Knowledge Company ("LRN"). LRN is a Delaware corporation, with its principal place of business located at 1100 Glendon Avenue, 7th Floor, Los Angeles, California. My office is located at this address.

3.     In my capacity as Senior Director of Human Resources at LRN, I am generally responsible for maintaining certain personnel records, for current and former employees. These records are maintained by me at LRN's offices in Los Angeles, California, under my direction and control. I personally reviewed the records referred to in this declaration. From my review of these records referred to herein, I have determined the following.

## I.     FACTS ABOUT LRN

4.     Founded in 1994, LRN provides outside businesses with corporate governance, ethics and compliance solutions, all with the aim of helping corporations and their employees to "Do the Right Thing." Our history is reflective of our employees' efforts to create an outstanding company that helps bring integrity to the foreground of the corporate world, as well as to create a customer community of leading, like-minded companies whose commitment to these values mirror our own. Simply stated, our mission is to help leading companies strengthen and grow corporate cultures that understand, respect and value both the letter and the spirit of the law.

5.     LRN has partnered with many of the world's most admired companies to develop the knowledge, education and operational solutions to address legal, compliance and ethical issues. Our integrated governance, compliance and ethics solutions are designed to help businesses manage and promote their reputations by fortifying their governance, ethics and compliance programs, and thereby building strong and enduring ethical corporate cultures.

1    6.    LRN creates and markets products that combine legal knowledge, technology and

2    hands-on expertise in the areas of complex governance and compliance management in order to

3    assist our clients in developing the processes that facilitate these crucial business objectives.

4    7.    For example, LRN creates customized courses for its clients in such areas as

5    corporate governance and reporting and legal compliance; international business and legal

6    compliance; compliance with corporate reporting and disclosure issues and legal obligations;

7    and human resources legal compliance, including compliance with state and federal non-

8    discrimination laws.  The products offered by LRN are primarily distributed through specially

9    designed software provided to LRN's clients, and in written course materials.  LRN regularly

10   copyrights its products and courses, in order to avoid unauthorized or unlawful use by a

11   competitor.

12   **II.    FACTS ABOUT MIDI CORP.**

13   8.    Founded in 1984, Midi Corp. ("Midi") describes itself using language indicating

14   that it is a direct competitor of LRN.  On its website, Midi states that it is also a leading provider

15   of "high-impact, ethics and compliance learning solutions."  Like LRN, Midi works with several

16   Fortune 1000 and other companies.

17   9.    According to its website, and like LRN, Midi markets itself as a leader in the

18   design and development of effective, interactive compliance and ethics learning solutions.  Also

19   like LRN, Midi describes itself as a company that provides software-based training to its clients.

20   **III.    THE PRODUCTS OFFERED BY LRN AND MIDI**

21   10.   Based on the information in Midi's website it competes in the same specialized

22   industry as LRN.  As competitors in the same specialized industry, LRN and Midi offer similar

23   products.  Based on the information contained in Midi's website, both LRN and Midi offer

24   software products for delivery in multiple modes, including online access, scaling to any

25   bandwidth requirement.  Based on the information contained in Midi's website, both LRN and

26   Midi provide materials for facilitated sessions to be delivered in classrooms, as well.

27   11.   Based on the information contained in Midi's website, both LRN and Midi

28   provide closely tailored, client-specific products.  Based on the information contained in Midi's

~LOSA1:144484.v3 /307008-10                    2

**DECLARATION OF JULIE MOLLESTON**

1  website, both LRN and Midi collaborate directly with their clients, so that each can deliver

2  compliance and ethics learning materials that are consistent with the particular needs of

3  particular clients.  Based on the information contained in Midi's website, both LRN and Midi

4  have the capacity to provide materials that are customized to particular client needs in multiple

5  languages and localized to address local laws, culture or customs.

6        12.    Based on the information contained in Midi's website, both LRN and Midi sell

7  their products to clients based on client-specific needs.  Indeed, LRN regularly receives highly

8  confidential and sensitive information from its clients, to be used by LRN in designing its

9  specially-tailored programs for its customers.

10  **IV.**   **FACTS ABOUT LRN'S EFFORTS TO MAINTAIN THE SECRECY OF ITS**

11       **CONFIDENTIAL PROPRIETARY INFORMATION AND TRADE SECRETS, TO PREVENT DISCLOSURE TO COMPETITORS SUCH AS MIDI**

12        13.    LRN takes serious and strong efforts to protect its trade secrets and confidential

13  proprietary information.  LRN seeks to maintain the secrecy of such information by storing the

14  data on company computers that are password protected and contained in password protected

15  websites.  The passwords to such information are provided only to those personnel with a need

16  to have access to such information in order to meet client service requirements.

17        14.    At the outset of employment, LRN requires each of its employees to agree to

18  maintain the secrecy of LRN's trade secrets and confidential proprietary information, as well as

19  the secrecy of the information provided to LRN by its clients.  In its written policies and

20  procedures, LRN consistently reminds its employees of the need to protect the company's trade

21  secrets and confidential proprietary information.

22       **A.**    **The First Nondisclosure Agreement**

23        15.    In addition, LRN requires its employees to execute a written non-disclosure

24  Agreement, as an irrevocable condition of employment.  The first Non-Disclosure Agreement

25  that LRN required employees to sign during the relevant time period provides, in pertinent part,

26  as follows:

27        (a)    LRN is engaged in the worldwide business of creating, managing and

28        disseminating legal knowledge in such forms including, but not limited to, legal research

**DECLARATION OF JULIE MOLLESTON**

1    and analysis, legal compliance and education, and knowledge management and

2    knowledge management systems (the "Business");

3         (b)    LRN possesses significant technical know-how, sales know-how, trade

4    secrets, and other confidential information (as defined below) that it has developed and

5    will continue to develop, and which information is and will be proprietary to it and an

6    exceedingly valuable asset;

7         (c)    my relationship with LRN has given me, and will continue to give me,

8    access to and possession of such know-how, trade secrets and other Confidential

9    Information;

10        (d)    LRN has a legitimate business interest in protecting the confidentiality of

11    such know-how, trade secrets and other Confidential Information;

12        (e)    LRN is a pioneer in business of creating, managing, and disseminating

13    legal knowledge and has developed, and will continue to develop significant goodwill,

14    including but not limited to significant relationships and contacts with current and

15    former customers and prospective customers; and

16        (f)    LRN has a legitimate business interest in protecting its goodwill from

17    competition on my part to the extent provided below.

18    16.    The first Non-Disclosure Agreement required by LRN then provided that each

19    employee must agree, in pertinent part, as follows:

20        (a)    I will not (except as necessary to perform specific employment duties

21    with LRN as directed by LRN), while in employ of LRN or thereafter, communicate or

22    divulge to, or use for the benefit of myself or any other person, firm, association, or

23    corporation, any Confidential Information.  All records, files, memoranda, reports, price

24    lists, customer lists, drawings, plans, sketches, documents, equipment, and the like,

25    relating to the business of LRN or to any Confidential Information which I may use or

26    prepare or come into contact with, shall remain the sole property of LRN, and I will

27    return all such items to LRN immediately upon LRN's request, or immediately upon

28    termination of my employment with LRN with or without such request.

**DECLARATION OF JULIE MOLLESTON**

1         (b)     For purposes of this agreement, "Confidential Information" includes any

2 information concerning: any inventions; discoveries; improvements; processes;

3 formulas; apparatus; equipment; methods; trade secrets; research; secret data; technical

4 know-how; computer files and programs; sales know-how; jobs know-how; customer

5 lists; the identity of any customers; customers, including but not limited to the identity of

6 any products or services furnished to specific customers, and the nature of any customer

7 preferences or other special requirements imposed by particular customers; prices,

8 including but not limited to pricing methods, pricing formulas, margins, discounts,

9 concessions, and adjustments; costs, including but not limited to researcher fees and any

10 methods and formulas used in setting researcher fees; or any other confidential matters

11 or information possessed, owned, or used by LRN that may be communicated to,

12 acquired by, or learned by me in the course of or as a result of my employment with

13 LRN or otherwise.

14      17.    In addition, the first Non-Disclosure Agreement required all LRN employees to

15 explicitly refrain from doing business with a competitor in a way that would disclose or

16 potentially disclose LRN's trade secrets or confidential proprietary information. The Non-

17 Disclosure Agreement provided, in pertinent part, that no LRN employee may:

18         (a)     solicit, directly or indirectly, any Business from any past or present

19 customer of LRN;

20         (b)     request or advise any past or present customer of LRN to withdraw,

21 curtail or cancel its business dealings with LRN;

22         (c)     participate or assist in the development, manufacture, sale or

23 procurement, or in the development, operation, management or financing of any

24 Business competitive with the Business [of LRN]; or

25         (d)     solicit any past, present or future employee, agent or independent

26 contractor of LRN to work or consult for any person.

27      18.    As a required condition of employment, the first Non-Disclosure Agreement

28 required by LRN further provided that anyone accepting employment with LRN agreed that the

**DECLARATION OF JULIE MOLLESTON**

1 company would be entitled to injunctive relief for violation of the Non-Disclosure Agreement.

2 The first Non-Disclosure Agreement provided, in pertinent part:

3      I hereby acknowledge and agree that a monetary remedy for any

4      breach of these covenants will be inadequate, and will be

5      impracticable and extremely difficult to prove, that such a breach

6      would cause irreparable harm, and that LRN shall be entitled to

7      temporary and permanent injunctive relief.

8     **B.**    **The Second Non-Disclosure Agreement**

9     19.    In addition to the first Non-Disclosure Agreement mentioned above, LRN

10 required its employees to sign a second Non-Disclosure Agreement, as a condition of

11 employment. The second Non-Disclosure Agreement defined LRN's trade secrets and

12 confidential proprietary information as follows:

13      "Information" shall include all information relating to LRN,

14      including but not limited to, its business, customers, personnel,

15      independent contractors, researchers, financial condition, plans,

16      products, intellectual property, analysis, projects, processes,

17      systems, marketing, research or development activities, and all

18      technical or scientific information or know-how of LRN or of any

19      other person or entity as to which LRN is obligated to maintain its

20      confidence, which is disclosed to Receiver [the LRN employee]

21      either orally, or in diagram, electronic, digital, written or other

22      recorded form that is not:

23        (a)    already known to Receiver prior to the date of this

24            Agreement or independently developed by

25            Receiver after the date hereof;

26        (b)    already publicly available or that becomes publicly

27            available other than through a breach of this

28            Agreement by Receiver; or

**DECLARATION OF JULIE MOLLESTON**

1           (c)     rightfully received by Receiver from a third party

2                   without similar restriction from such party and the

3                   disclosure of which, by such third party does not

4                   constitute a violation of an obligation by such third

5                   party to LRN; or

6           (d)     required to be disclosed pursuant to subpoena or

7                   other judicial process.

8      20.    The second Non-Disclosure Agreement further provided, in pertinent part:

9    Receiver will hold in confidence the Information and will not,

10   without the prior consent of LRN, either directly or indirectly:

11          (a)     make or use, for Receiver's own benefit or

12                  otherwise, any portion of the Information,

13                  including but not limited to any commercial use

14                  thereof; or

15          (b)     duplicate, disseminate, disclose or transfer any

16                  portion of the material or media on which the

17                  Information is presented to any other person,

18                  governmental agency, firm, business, or other

19                  entity.

20     21.    The second Non-Disclosure Agreement further provided that the LRN employee

21   agreed that LRN would be entitled to injunctive relief.  The second Non-Disclosure Agreement

22   stated as follows:

23       That because unauthorized disclosure of Information can have a

24       severe adverse impact on LRN's present and future competitive

25       position in the marketplace, that cannot be adequately

26       compensated by damages, LRN is entitled to obtain injunctive

27       relief in addition to all other equitable and legal remedies

28       available to it in connection therewith.

~LOSA1:144484.v3 /307008-10

7

**DECLARATION OF JULIE MOLLESTON**

22.    Both the first Non-Disclosure Agreement and the second Non-Disclosure Agreement explicitly provided that they are governed by California law.

## V.    FACTS ABOUT A. MERRILL PHILIPS

23.    A. Merrill Philips ("Philips") was an employee of LRN. Philips signed the first Non-Disclosure Agreement at the inception of her employment on December 9, 1999. A true and correct copy of the first Non-Disclosure Agreement signed by Philips is attached hereto as Exhibit A and incorporated herein by this reference. Philips also signed the second Non-Disclosure Agreement on December 2, 1999. A true and correct copy of the second Non-Disclosure Agreement signed by Philips is attached hereto as Exhibit B and incorporated herein by this reference.

24.    Philips began her employment with LRN as Regional Director, Customer Relations. In this position, Philips received an annual salary as well as commissions.

25.    LRN made a significant investment in Philips' training and development at the company.

26.    Philips was assigned increasing responsibilities to sell LRN's products to current and potential customers. Philips was responsible for maintaining daily sales activity calls to support a sales pipeline at a level required to achieve her sales target. Philips also was responsible for ensuring that new customer acquisition targets were met and that existing customer relationships were managed and expanded.

27.    As Philips continued her employment at LRN, she was responsible for executing effective prospecting techniques to help her schedule appointments with General Counsel and other executives of clients and prospective clients. Philips routinely received confidential client contact and prospecting information from LRN, which was developed at LRN's expense for her use in sales presentations.

28.    In addition, LRN provided Philips with confidential information to develop, deploy and share "best practices" relative to sales presentations and proposals. This information was provided so that it could be applied to the specific needs of LRN's clients, in order to customize LRN's message, as required.

29.    Throughout her employment, LRN furnished Philips with updated data so that she could work closely with current and prospective customers to ensure that they gain full value from their investment with LRN, and to ensure that LRN's clients and prospective clients kept abreast of current LRN products and services, so that she could increase the number of products and services purchased.

30.    Philips successfully used the data provided by LRN to forge significant client relationships.  During her employment with LRN, Philips was able to use LRN's internal resources to gain access to executives at several Fortune 1000 and other companies to make sales presentations.  When Philips successfully completed a sale, the typical fees paid by the client to LRN amounted to several thousand dollars for each product or service purchased. Philips received commissions based on these sales.

A.    **Philips' Resignation From LRN**

31.    Philips resigned her employment with LRN, effective February 4, 2005.  At the time of her resignation, Philips did not disclose that she intended to work for Midi, or any of LRN's competitors.

32.    At the time of Philips' resignation, Philips stated that she would not sign an Intellectual Property and Confidentiality Employee Confirmation (the "Confirmation"), a true and correct copy of which is attached hereto as Exhibit C and incorporated herein by this reference.

33.    The Confirmation provided, in pertinent part, as follows:

LRN takes the protection of its intellectual property and confidential information very seriously.  When you joined LRN you committed to help protect this information.  We and our customers and partners appreciate your continuing efforts.  Your responsibilities in this regard continue after your employment here.

34.    The Confirmation further provided as follows:

**DECLARATION OF JULIE MOLLESTON**

1    You have agreed to maintain all of LRN and LRN's customers'

2    confidential information in absolute secrecy. You should not take

3    any materials containing confidential information with you. You

4    may not directly or indirectly share or allow access to this

5    information.

6  **B.    Proprietary Information and Trade Secrets Retained by Philips**

7    35.    As of the date of Philips' departure from LRN, and consistently thereafter, LRN

8  has not received any confirmation that Philips has returned all of LRN's trade secrets and

9  confidential proprietary information, specifically including, but not limited to:

10    (a)    the confidential client contact information for the General Counsel and

11  other executives of LRN's clients and potential clients;

12    (b)    the products and product content that has been specifically customized

13  and tailored for particular customers and particular customer needs, which are protected

14  by copyright laws;

15    (c)    the data containing specific compliance or ethical issues disclosed to

16  LRN by LRN's clients or potential clients, so that LRN could create customized

17  products and solutions for those businesses;

18    (d)    the specific pricing of LRN's products offered to particular clients;

19    (e)    the duration and expiration date of LRN's individual contracts with

20  particular clients;

21    (f)    the "Requests for Proposals" or sales invitations provided to LRN by its

22  clients and prospective clients, including the types of products or services requested;

23    (g)    the salary, commission rates and confidential compensation arrangements

24  between LRN and its sales employees; and

25    (h)    the marketing research, client prospect data, purchasing habits, "best

26  practices" compilations, sales strategies, sales techniques, and other confidential

27  business generation information prepared by LRN.

28

~LOSA1:144484.v3 /307008-10

**DECLARATION OF JULIE MOLLESTON**

1  ## VI.    **FACTS ABOUT JULIE MORIARTY**

2      36.      Julie Moriarty ("Moriarty") was an employee of LRN.  Moriarty signed the first

3  Non-Disclosure Agreement at the inception of her employment on April 12, 2000.  A true and

4  correct copy of Moriarty's first Non-Disclosure Agreement is attached hereto as Exhibit D and

5  incorporated herein by this reference.  Moriarty also signed the second Non-Disclosure

6  Agreement on April 12, 2000.  A true and correct copy of Moriarty's second Non-Disclosure

7  Agreement is attached hereto as Exhibit E and incorporated herein by this reference

8      37.      Moriarty began her employment with LRN as Director of Knowledge Services,

9  and later held the title of Executive Programs Director.

10      38.      LRN made a significant investment in Moriarty's training and development at the

11  company.

12      39.      Moriarty's responsibilities included providing pre-sales support in order to assist

13  a team of sales executives in their ability to close more business transactions and reduce the time

14  expended in the sales cycle.  Moriarty was responsible for preparing documentation that could

15  be used by sales executives in their client presentations, and assisted in providing account

16  strategy.  She also attended sales meetings and helped drive sales to closure.

17      40.      Moriarty also worked to ensure that current clients remained as strong references

18  for other potential new business.  In this role, Moriarty was responsible for identifying and

19  addressing any reference issues that could affect new business, including comments from LRN's

20  clients about LRN's products, sales techniques, or client service.

21      41.      Moriarty also was responsible for working with other members of LRN's

22  management to identify the appropriate personnel and procedures for soliciting business to

23  particular clients.  She was also involved in resolving technical and implementation concerns so

24  that such issues would not preclude potential sales.

25      42.      Moriarty also developed new implementation and deployment practices for new

26  products, and compiled statistics for use by LRN's sales executives to better demonstrate LRN's

27  capacity and experience in the context of particular customer's business needs.  As Moriarty

28  stated in her own self-assessment of her performance, "I believe that my perspective on LRN's

1   and our customers' evolution has been critical to helping renewal customers understand LRN's

2   distinctions, the benefits of longer term partnership with LRN and the LRN community, and the

3   value of our program against our pricing."

4        43.    Moriarty also was heavily involved in managing LRN's existing customers by

5   sharing "best practices" and providing advice and guidance to ensure success.  Moriarty, based

6   on her interaction with LRN's clients and LRN's sales executives had intimate knowledge of

7   LRN's confidential sales targets, sales strategies, pricing points, sales contracts, sales renewal

8   issues, and client growth strategies.

9        44.    Moriarty, based on her written goals and objectives, was involved in virtually

10  every aspects of LRN's business strategy, marketing, and marketplace identity.  She had access

11  to all sales and client information available to any member of the sales force during her

12  employment at LRN.

13  **A.    Moriarty's Resignation From LRN**

14       45.    Moriarty resigned her employment with LRN, effective April 15, 2005.  At the

15  time of her resignation, Moriarty did not disclose that she intended to work for Midi, or any of

16  LRN's competitors, despite inquiries as to what she planned to do.

17  **B.    The Confidential Proprietary Information and Trade Secrets Maintained By Moriarty**

18

19       46.    As of the date of Moriarty's departure from LRN, and consistently thereafter,

20  LRN has not received any confirmation that Moriarty has returned all of LRN's trade secrets and

21  confidential proprietary information, specifically including, but not limited to:

22              (a)    the confidential client contact information for the General Counsel or

23       other executives of LRN's clients and potential clients;

24              (b)    the products and product content that has been specifically customized

25       and tailored for particular customers and particular customer needs, which are protected

26       by copyright laws;

27

28

**DECLARATION OF JULIE MOLLESTON**

(c)   the data containing the specific compliance or ethical issues disclosed to LRN by LRN's clients or potential clients, so that LRN could create customized products and solutions for those businesses;

(d)   the specific pricing of LRN's products offered to particular clients;

(e)   the duration and expiration date of LRN's individual contracts with particular clients;

(f)   the "Requests for Proposals" or sales invitations provided to LRN by its clients and prospective clients, including the types of products or services requested;

(g)   the salary, commission rates and confidential compensation arrangements between LRN and its employees;

(h)   best practice implementation and development practices developed at LRN; and

(i)   the marketing research, client prospect data, purchasing habits, "best practices" compilations, sales strategies, sales techniques, and other confidential business generation information prepared by LRN.

## VII.   FACTS ABOUT LRN'S PRIOR CEASE AND DESIST REQUESTS TO PHILIPS AND MORIARTY, IN CONNECTION WITH THEIR UNAUTHORIZED AND UNLAWFUL USE OF LRN'S TRADE SECRETS AND CONFIDENTIAL PROPRIETARY INFORMATION

47.   On approximately July 8, 2005, LRN learned, for the very first time, that Philips and Moriarty had accepted employment with Midi.  LRN also learned that Philips and Moriarty had accepted positions with Midi that required them to perform virtually the same job duties that they previously performed at LRN; namely, the marketing , sale, implementation and development of ethics and compliance products and solutions for Fortune 1000 and mid-size companies.

48.   LRN then immediately retained outside legal counsel to enforce its contractual and statutory rights.

49.   On July 13, 2005, LRN's outside legal counsel sent a cease and desist letter to Philips at her home in Washington, D.C., requesting an affirmation that Philips discontinue

1  using LRN's confidential proprietary information and trade secrets.  Specifically, LRN

2  requested an Affidavit from Philips promising that:

3      1.    You cease and desist from all conduct or activities that

4      violate your agreement not to use or disclose LRN's

5      "Confidential Information," as defined and prohibited by

6      the written employment agreement executed between you

7      and LRN;

8      2.    You do not make any use of LRN's trade secrets and/or

9      confidential proprietary information as defined by the

10      Uniform Trade Secrets Act, including its client lists and

11      information on client transactions, contemplated

12      transactions, marketing and pricing information;

13      3.    You immediately stop using LRN's trade secrets and/or

14      confidential proprietary information to solicit its clients,

15      on behalf of yourself or on behalf of any other business

16      entity;

17      4.    You immediately stop using LRN's trade secrets and/or

18      confidential proprietary information to solicit LRN's

19      employees to leave the company;

20      5.    You immediately return to LRN all originals and/or copies

21      of any of its documents, records, computer files, databases,

22      client lists, information or other materials of a confidential

23      or proprietary nature presently in your possession or under

24      your control;

25      6.    You immediately cease making representations about

26      LRN's business operations, its personnel or employment

27      policies, its client relationships, its client contracts, its

28      client pricing information, its marketing plans and

~LOSA1:144484.v3 /307008-10

14

**DECLARATION OF JULIE MOLLESTON**

1 strategies, its projected or historical revenues, its employee

2 turnover, its employee compensation or benefit

3 information, and any of its confidential business practices;

4 7. You immediately cease making any negative, untruthful or

5 disparaging remarks about LRN, its business practices, or

6 its treatment of you as an employee or its treatment of any

7 other current or former employee; and

8 8. You immediately cease any interference or attempted

9 interference with any business relationship between LRN

10 and any of its clients or employees.

11 A true and correct copy of this cease and desist letter is attached hereto as Exhibit F, and

12 incorporated herein by this reference.

13 50. On July 13, 2005, LRN's outside legal counsel sent a cease and desist letter to

14 Moriarty at her home in Manassas, Virginia, requesting an affirmation that Moriarty discontinue

15 using LRN's confidential proprietary information and trade secrets.  Specifically, LRN

16 requested an Affidavit from Moriarty promising that:

17 1. You cease and desist from all conduct or activities that

18 violate your agreement not to use or disclose LRN's

19 "Confidential Information," as defined and prohibited by

20 the written employment agreement executed between you

21 and LRN;

22 2. You do not make any use of LRN's trade secrets and/or

23 confidential proprietary information as defined by the

24 Uniform Trade Secrets Act, including its client lists and

25 information on client transactions, contemplated

26 transactions, marketing and pricing information;

27 3. You immediately stop using LRN's trade secrets and/or

28 confidential proprietary information to solicit its clients,

~LOSA1:144484.v3 /307008-10  15

**DECLARATION OF JULIE MOLLESTON**

1   on behalf of yourself or on behalf of any other business

2   entity;

3   4.   You immediately stop using LRN's trade secrets and/or

4   confidential proprietary information to solicit LRN's

5   employees to leave the company;

6   5.   You immediately return to LRN all originals and/or copies

7   of any of its documents, records, computer files, databases,

8   client lists, information or other materials of a confidential

9   or proprietary nature presently in your possession or under

10   your control;

11   6.   You immediately cease making representations about

12   LRN's business operations, its personnel or employment

13   policies, its client relationships, its client contracts, its

14   client pricing information, its marketing plans and

15   strategies, its projected or historical revenues, its employee

16   turnover, its employee compensation or benefit

17   information, and any of its confidential business practices;

18   7.   You immediately cease making any negative, untruthful or

19   disparaging remarks about LRN, its business practices, or

20   its treatment of you as an employee or its treatment of any

21   other current or former employee; and

22   8.   You immediately cease any interference or attempted

23   interference with any business relationship between LRN

24   and any of its clients or employees.

25   A true and correct copy of this letter is attached hereto as Exhibit G and incorporated herein by

26   this reference.

27

28

**DECLARATION OF JULIE MOLLESTON**

51.     On July 18, 2005, LRN's counsel received a response from Philips.  In her response, Philips refused to sign the Affidavit requested by LRN.  A true and correct copy of this response is attached hereto as Exhibit H, and incorporated herein by this reference.

52.     On July 18, 2005, LRN also received a response from Moriarty.  In her response, Moriarty also refused to sign the Affidavit requested by LRN.  A true and correct copy of this response is attached hereto as Exhibit I, and incorporated herein by this reference.

53.     On July 20, 2005, LRN's outside counsel sent another letter to Philips, again requesting that she promise under oath that she would discontinue using LRN's trade secrets and confidential proprietary information.  A true and correct copy of this letter is attached hereto as Exhibit J, and incorporated herein by this reference.

54.     On July 20, 2005, LRN's outside counsel sent another letter to Moriarty, again requesting that she promise under oath that she would discontinue using LRN's trade secrets and confidential proprietary information.  A true and correct copy of this letter is attached hereto as Exhibit K, and incorporated herein by this reference.

55.     On July 25, 2005, LRN sent another letter to Philips, providing her with a final opportunity to sign the Affidavit previously sent to her by LRN's counsel.  A true and correct copy of this letter is attached hereto as Exhibit L, and incorporated herein by this reference.

56.     On July 25, 2005, LRN sent another letter to Moriarty, providing her with a final opportunity to sign the Affidavit previously sent to her by LRN's counsel.  A true and correct copy of this letter is attached hereto as Exhibit M, and incorporated herein by this reference.

57.     On July 28, 2005, LRN's outside counsel received a letter from outside counsel for Philips and Moriarty.  In this letter, outside counsel for Philips and Moriarty stated that his clients would not sign an Affidavit, as previously requested three times by LRN.  A true and correct copy of this letter is attached hereto as Exhibit N, and incorporated herein by this reference.

58.     On July 30, 2005, LRN's outside counsel contacted outside counsel for Philips and Moriarty, to request, for a fourth time, that they sign the Affidavits as requested by LRN.  LRN's outside counsel was told that outside counsel for Philips and Moriarty was away from the

**DECLARATION OF JULIE MOLLESTON**

1    office until August 8, 2005. When outside counsel for Philips and Moriarty returned, he told

2    LRN's outside counsel that Philips and Moriarty would be unwilling to sign the Affidavit

3    requested by LRN and that there would be no further communication from his clients on this

4    issue.

5         59.    Having made numerous attempts to resolve matters without the need to initiate

6    litigation, and having received repeated refusals from Philips and Moriarty in response to LRN's

7    request for an Affidavit that they discontinue using LRN's trade secrets and confidential

8    proprietary information, LRN determined that it would be forced to file suit in order to protect

9    its statutory and contractual rights.

10        I declare under penalty of perjury under the laws of the State of California and the

11   United States of America that the foregoing is true and correct.

12        Executed this _15th_ day of August, 2005, at Los Angeles, California.

13

14                                          _Julie Molleston_

15                                          JULIE MOLLESTON

16

17

18

19

20

21

22

23

24

25

26

27

28

                                DECLARATION OF JULIE MOLLESTON

# EXHIBIT A

December 2, 1999


LRN, Inc.
2029 Century Park East
Suite 1370
Los Angeles, CA  90067


Gentlemen:

     This letter confirms my agreement regarding certain matters relating to my employment with LRN, Inc. ("LRN").  I am entering into this agreement in recognition of certain facts – namely, that

     (a)  LRN is engaged in the worldwide business of creating, managing, and disseminating legal knowledge in such forms including but not limited to legal research and analysis, legal compliance and education, and knowledge management and knowledge management systems (the "Business");

     (b)  LRN possesses significant technical know-how, sales know-how, trade secrets, and other Confidential Information (as defined below) that it has developed and will continue to develop, and which information is and will be proprietary to it and an exceedingly valuable asset;

     (c)  my relationship with LRN has given me, and will continue to give me, access to and possession of such know-how, trade secrets and other Confidential Information;

     (d)  LRN has a legitimate business interest in protecting the confidentiality of such know-how, trade secretes and other Confidential Information;

     (e)  LRN is a pioneer in business of creating, managing, and disseminating legal knowledge and has developed, and will continue to develop significant goodwill, including but not limited to significant relationships and contacts with current and future customers and prospective customers; and

     (f)  LRN has a legitimate business interest in protecting its goodwill from competition on my part to the extent provided below.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, I hereby agree as follows:

1.   I will not (except as necessary to perform specific employment duties with LRN as directed by LRN), while in the employ of LRN or thereafter, communicate or divulge to, or use for the benefit of myself or any other person, firm, association, or corporation, any Confidential Information.  All records, files, memoranda, reports, price lists, customer lists, drawings, plans, sketches, documents, equipment, and the like, relating to the business of LRN or to any Confidential Information, which I may use or prepare or come into contact with, shall remain the sole property of LRN, and I will return all such items to LRN immediately upon LRN's request, or immediately upon termination of my employment with LRN with or without such request.

2.   For purposes of this agreement, "Confidential Information" includes any information concerning:  any inventions; discoveries; improvements; processes; formulas; apparatus; equipment; methods; trade secrets; research; secret data; technical know-how; computer files and programs; sales know-how; jobs know-how; customer lists; the identity of any customers; customers, including but not limited to the identity of any products or services furnished to specific customers, and the nature of any customer preferences or other special requirements imposed by particular customers; prices, including but not limited to pricing methods, pricing formulas, margins, discounts, concessions, and adjustments; costs, including but not limited to researcher fees and any methods and formulas used in setting researcher fees; or any other confidential matters or information possessed, owned, or used by LRN that may be communicated to, acquired by, or learned of by me in the course of or as a result of my employment with LRN or otherwise.

3.   I hereby covenant and agree that, for a period commencing on the date hereof and ending one year following the termination of my employment with LRN, I will not, directly or indirectly, in any state or county in the United States or any other foreign country or jurisdiction in which LRN is presently doing business or may hereafter do business, do, or directly or indirectly aid any other person or entity to do, any of the following:

    (i)    engage in the Business, any aspect of the Business; or have any interest or involvement (whether as an agent, employee, consultant, advisor, creditor, proprietor, partner, stockholder, officer, director or other type of principal) in, or render any services to, any person, firm, corporation, association or other entity which is engaged in or becomes engaged in the Business;

    (ii)    solicit, directly or indirectly, any Business from any past or present customer of LRN;

    (iii)    request or advise any past or present customer of LRN to withdraw, curtail or cancel its business dealings with LRN;

    (iv)  participate or assist in the development, manufacture, sale or procurement, or in the development, operation, management or financing of any Business competitive with the Business; or

    (v)  solicit any past, present or future employee, agent or independent contractor of LRN to work or consult for any person.

4.  I hereby acknowledge and agree that a monetary remedy for any breach of these covenants will be inadequate, and will be impracticable and extremely difficult to prove, that such a breach would cause irreparable harm, and that LRN shall be entitled to temporary and permanent injunctive relief.

5.  The covenants contained herein constitute a series of separate covenants, one for each of those counties and states in the United States and each of those foreign countries or jurisdictions referred to above. Except for geographic coverage, each such separate covenant contained herein shall be deemed identical in terms. If in any judicial proceeding a court shall hold unenforceable any of the separate covenants deemed included herein, then such unenforceable covenant or covenants shall be deemed eliminated from the provisions of this agreement for the purpose of such proceeding or changed to the extent necessary to permit the remaining separate covenants to be enforced in such proceeding. Each paragraph, clause, sub-clause and provision of this agreement shall be severable from each other, and if for any reason any paragraph, clause, sub-clause or provision is invalid or unenforceable, such invalidity or unenforceability shall not prejudice or in any way affect the validity or enforceability of any other paragraph, clause, sub-clause or provision. This agreement and each paragraph, clause, sub-clause and provision hereof shall be read and construed so as to give full effect thereto, subject only to any contrary provision of law. To the extent that this agreement or any paragraph, clause, sub-clause or provision hereof would, but for the provisions of this paragraph, be construed as void and ineffective, it shall nevertheless be a valid agreement, covenant, paragraph, clause, sub-clause or provision as the case may be, enforceable to the full extent to which it is not contrary to any provision of law.

7.  This Agreement shall be governed by the Laws of the State of California.

8.  Nothing herein shall be deemed to affect the fact that my employment with LRN is at-will and terminable by either party at any time with or without cause.

Sincerely,

A. Merrill Phillips

*LRN Non-compete Agreement*                                                      *Page 3*