## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LRN CORPORATION,⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀Case No. 1:05CV01652
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀Judge: Emmet G. Sullivan
A. MERRILL PHILIPS,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀Defendant.⠀⠀⠀⠀⠀)

## MEMORANDUM IN OPPOSITION
## TO MOTION FOR PRELIMINARY INJUNCTION

The defendant, A. Merrill Philips ("Philips"), submits the following as her memorandum in opposition to the plaintiff's motion for a preliminary injunction:

### I

### Preliminary Statement

In this suit, the plaintiff, LRN Corporation ("LRN"), is seeking to use this Court as a device to force its former employee, Philips, to sign an affidavit and to make representations and promises she is not required to make. Under the guise of a trade secrets claim, LRN asks this Court to force Philips to refrain from doing what she is not doing and never has done. Incredibly, LRN concedes that it has no evidence to support its claims. It relies solely upon unfounded innuendo and baseless fears to try to create a trade secrets case where none exists in an attempt to harm the reputation of one of its former employees. LRN seeks to use the powerful and potentially devastating remedy of a preliminary injunction to injure Philips, not to avoid any injury to itself. This brief will demonstrate that, without question, LRN's motion for a preliminary injunction must be denied because LRN has failed to carry any burden, much less the heavy burden it bears.

There are several fundamental and fatal flaws in LRN's request for a preliminary injunction. First, the memorandum and affidavit upon which LRN bases its motion are devoid of any factual substance, relying on innuendo and unsupported assertions that are directly contradicted by documents and substantive evidence presented. Indeed, read carefully, LRN claims that Philips "may" violate its trade secrets or that its purported trade secrets "have been or will be" misappropriated. Obviously, this is not sufficient to justify the granting of extraordinary, or any, relief.

Second, and related to the above, LRN's complaint is not truly that Philips has violated any legal obligation to LRN. Rather, the basis for LRN's claims is Philips' refusal to sign an affidavit prepared by LRN's counsel. LRN's affidavit would have required Philips to implicitly, if not explicitly, falsely concede she had acted in an improper manner, and would have required her to agree to new terms to which she was not obligated to agree. Simply put, the basis for LRN's claims is that Philips would not succumb to LRN's overreaching. This, too, is not a basis for injunctive relief.

LRN's memorandum provides a thorough discussion of what constitutes a trade secret and the relief that is available to a company victimized by trade secret misappropriation. Yet LRN omits mention of a single trade secret that Philips has misappropriated or threatens to misappropriate. This omission is intentional – LRN knows that Philips has not misappropriated its trade secrets and has never threatened to do so. Indeed, Philips has provided affirmative assurances otherwise to LRN. Yet because Philips would not sign a false affidavit prepared by LRN, which affidavit stated that Philips had violated its trade secret rights and which sought to impose new restrictions on Philips, LRN filed this baseless suit.

## II

## Facts

A detailed factual background is contained in the Declaration of A. Merrill Philips, attached as *Exhibit 1*. Briefly stated, the following responds to the various "facts" set forth in LRN's Memorandum:

**A.    Philips Has Neither Misappropriated Nor Threatened To Misappropriate LRN's Trade Secrets Or Confidential Information, Nor Has She Violated Any Contractual Obligations to LRN**

Philips has neither used nor disclosed any confidential information or trade secrets belonging to LRN, and does not intend to do so.  (Philips Decl. ¶ 1).  In fact, Philips has taken extraordinary means to ensure that she is in compliance with her legal obligations, and has taken measures to avoid even the appearance of impropriety.  (Philips Decl. ¶ 1).  Before leaving LRN and joining Midi, her new employer, Philips consulted with legal counsel, and signed an agreement with Midi promising not to use any information belonging to LRN.  (Philips Decl. ¶ 1).  Further, after hearing that LRN had accused her of wrongdoing, she asked Jeff London, a lawyer from Chicago to assure LRN that she had done nothing wrong and to demand any evidence LRN had to the contrary.  (Philips Decl. ¶ 1).  Mr. London wrote LRN's counsel on July 28, 2005, attached hereto as *Exhibit A.*  To Philip's knowledge, LRN never responded to the letter.  (Philips Decl. ¶ 1).

LRN pricing, contract terms, business strategies and other information LRN now cites as confidential were openly provided to current and former LRN clients and prospects.  (Philips Decl. ¶ 2).  Nonetheless, Philips has not discussed this kind of information with anyone, including Midi.  (Philips Decl. ¶ 2).

3

Philips returned or destroyed all LRN information received during her employment with LRN. (Philips Decl. ¶ 3). Before leaving LRN, Philips asked LRN's Human Resources representative, Joanna Jose, if she should return to LRN the information in her possession, or whether she should destroy it. (Philips Decl. ¶ 3). Ms. Jose told Philips to destroy the information and return only her laptop, blackberry and cell phone. (Philips Decl. ¶ 3). Philips destroyed all LRN information in her possession and returned her laptop and blackberry. (Philips Decl. ¶ 3). Philips has not used the cell phone number she was using while employed by LRN since learning from an LRN administrative person, Isabella Aguilerra, that, although LRN provided Philips with a form in her exit packet to transfer the cell phone number (which Philips had long before joining LRN) back to her personally, LRN had decided she could not have the number back. (Philips Decl. ¶ 3).

Further, the "trade secrets" cited by LRN are not confidential. The General Counsel and executive contact information that LRN now claims is Trade Secret and/or Proprietary information is public information, available on the Internet. (Philips Decl. ¶ 4). Nonetheless, Philips has stated that she has not and will not use any LRN customer or contact lists. (Philips Decl. ¶ 4). Moreover, much of the information that LRN now claims is confidential is: (a) routinely given out in presentations, (b) discussed in conversations with prospects and customers without non disclosure agreements or other protections in place and/or (c) revealed by customers and prospects of LRN. (Philips Decl. ¶ 5). Still, Philips has not disclosed LRN confidential or proprietary information to anyone. (Philips Decl. ¶ 5).

As to LRN's pricing data, Philips lacks sufficient knowledge of LRN pricing to use it even if she desired to do so. (Philips Decl. ¶ 6). LRN's pricing structure was very complex, changed frequently and was applied inconsistently. (Philips Decl. ¶ 6). As a result, Philips

almost always obtained pricing for a particular situation (customer/prospect and facts) from LRN Sales Operations or management.  (Philips Decl. ¶ 6).  Philips never used a price list to do pricing for customers and rarely had any involvement in pricing.  (Philips Decl. ¶ 6).  However, in any event, Philips has not disclosed and would not disclose any LRN pricing information. (Philips Decl. ¶ 6).

The "best practices compilations" LRN now claims are confidential were routinely set forth in public presentations and marketing materials (e.g. Ethics Officer Association meetings, Webinars, etc.).  (Philips Decl. ¶ 7).  Some, if not all, of these "best practices" are also available on LRN's public Internet site.  (Philips Decl. ¶ 7).  Further, many other organizations and individuals in the ethics and compliance area promote the same practices.  (Philips Decl. ¶ 7).

**B.    LRN Did Not Expend Sufficient Efforts to Protect the Information Which It Now Claims Is Confidential**

LRN's Affiant, Julie Molleston, has been employed with LRN for approximately 8 months, and thus has very little knowledge of what Philips did for LRN on a daily basis and almost no knowledge of what information Philips had in her possession as a result of her position.  (Philips Decl. ¶ 8).  In fact, no current or former LRN manager, except LRN's CEO, Dov Seidman ("Seidman"), would have much institutional knowledge of Philips or company practices regarding the protection and management of the information which LRN now claims as confidential and trade secrets.  (Philips Decl. ¶ 9).  In the five years Philips worked for LRN, the company had at least five different heads of Human Resources and numerous others below them who ordinarily stayed for less than a year.  (Philips Decl. ¶ 9).  The same is true for almost all other management positions.  (Philips Decl. ¶ 9).

LRN's customer list is highly publicized by LRN.  LRN's customer list is posted on its website.  (Philips Decl. ¶ 10).  Nonetheless, since joining Midi, to avoid even the appearance of

impropriety, Philips has not solicited business from current LRN customers or provided Midi contact information to them. (Philips Decl. ¶ 10). In addition, to avoid the appearance of impropriety, Philips does not attend any meetings with current LRN customers that have been arranged by Midi sales personnel. (Philips Decl. ¶ 10).

Many of the items that LRN alleges were maintained as confidential, were actually not maintained in that manner. (Philips Decl. ¶ 11). For example, LRN's client list was, until recently, published on the Internet and can still be found there on archive Internet sites. (Philips Decl. Ex. A, B). In addition, LRN routinely issues press releases when it signs on new clients. (Philips Decl. ¶ 11). Much, if not most, of the information now identified by LRN as confidential was disseminated to the sales organization, published on LRN's Intranet and routinely communicated to current and potential LRN customers. (Philips Decl. ¶ 11).

### C.    Philips Was Justified In Refusing To Sign LRN's Proposed Affidavit

Philips did not sign the Affidavit that was proposed by LRN's attorneys because she already had signed confidentiality and trade secrets agreements and was in compliance with all of her obligations under those agreements. (Philips Decl. ¶ 14). Further, and more important, the proposed Affidavit implied that Philips had done, or intended to do, something wrong. (Philips Decl. ¶ 14). Understandably, given that she had done nothing wrong (and indeed took extreme steps to avoid even the appearance that she was), Philips was unwilling to sign something implying that she acted improperly. (Philips Decl. ¶ 14). LRN's proposed affidavit also demanded that Philips confirm that she would "cease making representations about LRN's … employee turnover" and "cease making any negative, untruthful or disparaging remarks about LRN, its business practices, or its treatment of me as an employee or its treatment of any other current or former LRN employee." See LRN's Memorandum, Ex. G. While Philips did not say

negative things about LRN's turnover or management practices to potential customers, she had and has no obligation to refrain from doing so.  (Philips Decl. ¶ 15).  LRN's demand was a transparent attempt by LRN to stifle information about the company's high employee turnover, low morale and poor management.

**D.    Philips Had No Obligation to Tell LRN That She Was Joining Midi and Did Not Disclose Her New Employment Status for Valid Reasons**

LRN's poor treatment of Philips and other current and former LRN employees – including Seidman's public, derogatory comments about current and former employees – made Philips conclude that Seidman would harass and defame her if he knew she was joining a competitor.  (Philips Decl. ¶ 16).  The fact that, without any foundation, LRN has now sued Philips and another former employee, Julie K. Moriarty ("Ms. Moriarty"), for the supposed use of confidential information – without any evidence of wrongdoing – demonstrates that LRN is willing to use any means, including a frivolous law suit, to personally hurt and defame Philips and Ms. Moriarty.  (Philips Decl. ¶ 16).

Seidman and LRN management have a history of publicly making derogatory and/or untrue statements about people who leave the company.  (Philips Decl. ¶ 17).  For example, a few years ago, a senior manager at LRN sent an email to the entire sales and services organizations saying that an LRN sales person, Tom Sullivan, had been fired, when he actually had resigned.  (Philips Decl. ¶ 17).  When Seidman received objections to the message from a number of people, including Philips, as being grossly inappropriate – particularly for a company in the ethics business – no retraction or apology was ever made.  (Philips Decl. ¶ 17).  LRN has also publicly announced (in company-wide town halls, voice mails, memos, etc.) the firing of certain individuals and the reasons for their terminations.  (Philips Decl. ¶ 17).

A few years ago, when Philips questioned the wisdom of publicly announcing firings (in an era when most companies have neutral reference policies), Seidman told Philips that he was concerned about LRN turnover and wanted employees to know when LRN had fired people, so employees would not assume the terminated employees left on their own. (Philips Decl. ¶ 18).

Philips's concerns about what Seidman would do when he found out she had joined a competitor were realized soon after he became aware she was with Midi. Philips has been told by a number of LRN employees that Seidman recently made derogatory statements about Philips and Ms. Moriarty in LRN meetings with large numbers of employees present. (Philips Decl. ¶ 19). While LRN loses an abnormally high portion of its employees every year, it is believed that Philips and Ms. Moriarty are the first LRN employees who went directly to a competitor. (Philips Decl. ¶ 19). Despite the great talent pool of former employees of LRN, and their expressed commitment to the ethics and compliance industry, many departing employees leave the industry, as they are afraid of Seidman and what he could do to their reputations and ability to earn a living. (Philips Decl. ¶ 19). For example, one former LRN sales executive, Julie Angevine, left LRN for an E-Learning company, SkillSoft, which did not specialize in the ethics and compliance training field. (Philips Decl. ¶ 20). Even though LRN did not consider SkillSoft a competitor, Seidman sent Angevine and the CEO of SkillSoft letters threatening litigation if Angevine worked for SkillSoft. Angevine lost her job with SkillSoft shortly thereafter. (Philips Decl. ¶ 20).

E.    **LRN's Concern Is Not Disclosure of the Information Which LRN Claims Is Confidential, But Disclosure of Its Poor Management Practices and Company Culture**

Philips felt she had no choice but to leave LRN, as she concluded that she could no longer tolerate selling programs designed to teach ethics and compliance from a company she

believed was unethical and exercised poor business practices.  (Philips Decl. ¶ 21).  Philips was

concerned about LRN's high rate of employee turnover, low employee morale, poor success

record for women in management, atmosphere of distrust of management, and difficulty in

developing reliable products and delivering them on time.  Id.  She did not leave with the

intention of, and has not, misappropriated or threatened to misappropriate, LRN's trade secrets or

confidential information.

## III

## ARGUMENT

### A.    LRN Has a Heavy Burden In a Baseless Case

A preliminary injunction is a powerful remedy that should not be awarded in a "doubtful"

case:

> There is no power the exercise of which is more delicate, which
> requires greater caution, deliberation, and sound discretion, or is
> more dangerous in a doubtful case, than the issuing of an
> injunction.  It is the strong arm of equity, that never ought to be
> extended unless to cases of great injury, where courts of law
> cannot afford an adequate or commensurate remedy in damages.
> The right must be clear, the injury impending or threatened, so as
> to be averted only by the protecting preventive process of
> injunction.  But that will not be awarded in doubtful cases, or new
> ones coming within well-established principles; for if it issues
> erroneously, an irreparable injury is inflicted for which there can
> be no redress, it being the act of a court, not of the party who prays
> for it.

J. Story, Commentaries on Equity Jurisprudence, 639-40 n.3 (14th ed. 1918).  Further, the D.C.

Circuit Court of Appeals has recognized that the plaintiff carries a heavy burden of persuasion to

obtain a preliminary injunction because such relief is "an extraordinary and drastic remedy," one

that should be granted "sparingly" and not at all unless the plaintiff meets its burden by "a clear

showing." Dorfmann v. Boozer, 414 F.2d 1168, 1173 (D.C. Cir. 1969). See also, Mazurek v. Armstrong, 520 U.S. 968, 972 (1997).

The D.C. Circuit Court of Appeals has articulated four factors to be applied when considering issuance of a preliminary injunction: (1) plaintiff's likelihood of success on the merits; (2) whether plaintiff will suffer irreparable injury if relief is denied; (3) injury to defendant or other interested parties if the injunction is issued; and (4) the public interest. Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004), Katz v. Georgetown Univ., 246 F.3d 685, 687-88 (D.C. Cir. 2001). See also Barton v. Venneri, 2005 U.S. Dist. LEXIS 9765 (D.C. 2005).[1]

The Cobell test requires this Court to balance the strengths of the plaintiffs arguments in each of the four required areas. CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 747 (D.C. Cir. 1995). However, "it is particularly important for plaintiff to demonstrate a substantial likelihood of success on the merits; where a plaintiff cannot show a likelihood of success on the merits, 'it would take a very strong showing with respect to the other preliminary injunction factors to turn the tide in plaintiff['s] favor.'" Barton, 2005 U.S. Dist. LEXIS 9765, *3 (citing Davenport v. Int'l Bhd. of Teamsters, AFL-CIO, 166 F.3d 356, 366-67 (D.C. Cir. 1999)). Thus, the likelihood of plaintiff's success on the merits affects the degree of irreparable harm plaintiff must show in order to prevail. If the likelihood of success on the merits is remote, plaintiff must make a strong showing of irreparable harm. See id. Further, for the plaintiff to adequately show irreparable harm, the alleged harm must be "concrete and immediate" to justify

---

[1] If the Court deems the applicable standard to be that provided under California law, pursuant to Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938), the California standard is virtually identical to that provided in Cobell. See Metro Publishing, Ltd. v. San Jose Mercury News, 987 F.2d 637, 639 (9th Cir. 1993) ("To obtain a preliminary injunction, a party must demonstrate either 1) a combination of probable success on the merits and the possibility of irreparable injury, or 2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in its favor.").

injunctive relief, and "vague or speculative injury" will not suffice. <u>Wisconsin Gas Co. v. Fed.</u> <u>Regulatory Comm'n</u>, 758 F.2ds 669, 674 (D.C. Cir. 1985) ("the injury must be both certain and great; it must be actual and not theoretical"). Essentially, "the threatened injury must be of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm, because injunctions are not intended 'to prevent injuries neither extant nor presently threatened, but only merely feared.'" <u>Barton</u>, 2005 U.S. Dist. LEXIS 9765, *3 (citing <u>Comm. in Solidarity v.</u> <u>Sessions</u>, 929 F.2d 742, 745-46 (D.C. Cir. 1991)). Where, as here, the plaintiff lacks a strong showing of likelihood of success on the merits or irreparable harm, a temporary injunction should be denied. Therefore, as Mr. Justice Story instructs, if the case is doubtful—i.e., the merits weak or substantially suspect—a preliminary injunction should not issue. <u>See</u> <u>also</u> D. Dobbs, <u>Law</u> of <u>Remedies</u>, 108-09 (1973) and O. Fiss, <u>Injunctions</u>, 168 (1972), noting that even a substantial dispute as to the facts may furnish a strong reason to deny relief.

**B.    <u>LRN's Chances of Success on the Merits Are Remote and Doubtful, at Best</u>**

LRN's brief makes it abundantly clear that it is not seeking the return or cessation of use of stolen trade secrets (as it has no evidence that Philips is using or threatening to use any such trade secrets), but rather seeks to punish Philips, by forcing her to defend a frivolous lawsuit, for going to work for a competitor.

Incredibly, LRN presents no <u>facts</u> to support its legal argument that Philips has used, is using or threatens to use its trade secrets. Instead, it states only that it has a "strong belief that confidential information is being used." (LRN Memorandum at 1). This false belief is apparently founded upon matters that were caused by LRN's own misconduct, or which are provably false. LRN's bases its conclusion on its assertions that Philips did not disclose that she was going to work for Midi, did not acknowledge return of confidential information in her

possession, and failed to sign an affidavit that LRN demanded that she sign (despite LRN's knowledge that Philips believed portions of that affidavit to be false). (LRN Memorandum at 5). As will be shown below, LRN will not prevail on the merits.

1.    **LRN Presents No Facts to Support a Claim That Philips Has or Threatens to Reveal Any of LRN's Confidential Information or Trade Secrets.**

Under the California Uniform Trade Secrets Act (CUTSA), a prima facie claim for misappropriation of trade secrets requires the plaintiff to demonstrate: (1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the plaintiff. Cal. Civ. Code § 3426.1; Sargent Fletcher, Inc. v. Able Corp., 110 Cal. App. 4th 1658, 1665, 3 Cal. Rptr. 3d 279, 283 (2003). "Improper means" includes, for example, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy. Cal. Civ. Code § 3426.1(a). Thus, in order to state a claim, a plaintiff must demonstrate both that a trade secret exists and that the defendant's behavior constituted a misappropriation. In other words, the plaintiff must establish that the defendant actually improperly "used" the trade secret. Id. at 1665; See also Ernest Paper Products, Inc. v. Mobil Chem. Co., Inc., 1997 U.S. Dist. LEXIS 21817, *13, 15 (C.D. Ca. 1997). The plaintiff bears the burden of proof on this issue, both at the outset and during trial. Sargent Fletcher, 110 Cal. App. 4th at 1665. Shifting the burden of proof in trade secret cases has been explicitly rejected as inappropriate and unnecessary. See id.

"The mere existence of an agreement not to use plaintiff's trade secrets does not relieve plaintiff of the burden to prove that the defendant accused of appropriating the trade secrets did in fact make use of them, and that the use was prohibited by the agreement." Litton Systems, Inc. v. Honeywell Inc., 1995 U.S. Dist. LEXIS 729 (C.D. Ca. 1995). In Litton, the court found

that the plaintiff did not meet the burden of proving that it had any trade secrets, and, if so, what they were; no attempt was made to prove which trade secrets were actually used, what they were used for or when they were used.  Moreover, a contract to restrict the use of trade secrets cannot itself establish that trade secrets actually existed or that they were infringed.  See id. at 153 (citing Scott v. Snelling & Snelling, Inc., 732 F. Supp. 1034 (N.D. Cal. 1990)).

### a.    The Items Cited By LRN Are Not Protectable Trade Secrets

LRN states that Philips had, at one time, access to various purported trade secrets. Included amongst these purported trade secrets are contact information for corporate general counsels, copyrighted product information, customer-specific data disclosed to LRN by its customers, pricing data for particular clients, the duration and expiration dates of LRN contracts, requests for proposals issued by clients and prospective clients, salary data for LRN employees, and marketing research, client prospect data, purchasing habits, "best practices" compilations, sales strategies and sales techniques.  (LRN Memorandum at 12).  Most, if not all, of this information is not protectable.

The General Counsel and executive contact information that LRN now claims is Trade Secret and/or Proprietary information is publicly available information, available on the Internet. Moreover, much of the information that LRN now claims is confidential is: (a) routinely given out in presentations, (b) discussed in conversations with prospects and customers without non disclosure agreements or other protections in place and/or (c) revealed by customers and prospects of LRN.

Philips lacks sufficient knowledge of LRN pricing to use it even if she desired to do so. LRN's pricing structure was very complex, changed frequently and was applied inconsistently. As a result, Philips almost always obtained pricing for a particular situation (customer/prospect

and facts) from LRN Sales Operations or management. Philips never used a price list to do pricing for customers and rarely had any involvement in pricing. Furthermore, the "best practices compilations" LRN now claims are confidential were routinely set forth in public presentations and marketing materials. Some, if not all, of these "best practices" are also available on LRN's Internet site. Also, many other organizations and individuals in the ethics and compliance area promote the same practices.

In addition, LRN's customer list is highly publicized by LRN. LRN's customer list is posted on its website. Information posted on the internet cannot be a trade secret. See Religious Tech. Center v. Lerman, 908 F. Supp. 1362, 1368 (E.D. Va. 1995). Further, publicly-known or available client lists are not trade secrets. See Steinberg Moorad & Dunn, Inc. v. Dunn, 136 Fed. Appx. 6, 11, 2005 U.S. App. LEXIS 5162, **12 (9th Cir. 2005). Moreover, LRN routinely issues press releases when it signs on new clients. Much, if not most, of the information now identified by LRN as confidential was disseminated to the sales organization, published on LRN's Intranet and routinely communicated to current and potential LRN customers.

### b. Philips Has Not Used LRN's Trade Secrets Through Improper Means

LRN identifies not one trade secret or item of confidential information that Philips has misappropriated or threatens to misappropriate. Indeed, by letter dated July 28, 2005 (LRN Memorandum, Ex. N), Philips's counsel advised LRN's counsel that Philips was not violating any of her obligations to LRN and stated "If, at any time, LRN has a factual basis to support its position that [Philips is] in violation of this non-disclosure provision, we encourage LRN to provide us with some substantive support for such a basis, and Midi will promptly investigate it." LRN did not provide any facts in response to this letter, and has provided none in its complaint or in its memorandum in support of its motion for preliminary injunction.

Instead of presenting facts to support its claims, LRN contends that it "believes" Philips "may" be misappropriating its confidential information because it contends that Philips did not disclose that she was going to work for Midi, did not acknowledge return of confidential information in her possession, and failed to sign an affidavit that LRN demanded that she sign. Conceding that it cannot identify <u>any</u> trade secrets that Philips has misappropriated or threatened to misappropriate, LRN asks "Why else would she not disclose that she would be working for Midi, not sign the Affidavit, and not return the confidential information in her possession." (LRN Memorandum at 26). The <u>facts</u> relative to each of these contentions will be addressed *seriatim* below.

      i.    *Philips Did Not Reveal That She Was Going to Work For Midi Because LRN Has a History of Making False Statements About Employees Who Leave LRN.*

LRN first states that Philips did not reveal that she was going to work for Midi. This is true. Philips had good reason for not revealing this information to LRN. LRN's poor treatment of Philips and other current and former LRN employees - including Seidman's public, derogatory comments about current and former employees – made Philips conclude (correctly, as evidenced by this lawsuit) that Seidman would harass and defame Philips if he knew she was joining a competitor.

Seidman and LRN management have a history of publicly making derogatory and/or untrue statements about people who leave the company. For example, a few years ago, a senior manager at LRN sent an email to the entire sales and services organizations saying that an LRN sales person, Tom Sullivan, had been fired, when he had actually resigned. When Seidman received objections to the message from a number of people as being grossly inappropriate – particularly for a company in the ethics business - no retraction or apology was ever made. LRN

has also publicly announced (in company-wide town halls, voice mails, memos, etc.) the firing of certain individuals and the reasons for their termination. When Philips questioned the wisdom of publicly announcing firings (in an era when most companies have neutral reference policies), Seidman told her that he was concerned about LRN turnover and wanted employees to know when LRN had fired people, so employees would not assume the terminated employees left on their own.

Philips's concerns about what Seidman would do when he found out she had joined a competitor were realized soon after he became aware she was with Midi. Philips has been told by a number of LRN employees that he recently made derogatory statements about Philips in LRN meetings with large numbers of employees present. Philips was, and is, concerned that Seidman is making these comments in the business community, which could ruin her reputation and ability to earn a living in the ethics and compliance field, which is relatively small. While LRN loses an abnormally high portion of its employees every year, it is believed that Philips and Ms. Moriarty are the first LRN employees to go directly to a competitor. A primary reason that so few LRN employees go to work for competitors is fear of Seidman and what he could do to their reputations and ability to earn a living. For example, one former LRN sales executive, Julie Angevine, left LRN for an E-Learning company, SkillSoft, which did not specialize in the ethics and compliance training field. Even though LRN did not consider SkillSoft a competitor, Seidman sent Angevine and the CEO of SkillSoft letters threatening litigation if Angevine worked for SkillSoft. Angevine lost her job with SkillSoft shortly thereafter. Thus, Philips's reluctance to reveal that she was going to work for Midi was understandable. It has no connection with trade secrets or confidential information.

ii.    *Philips Did Acknowledge That She Returned All of LRN's Confidential Information.*

LRN next contends that Philips did not acknowledge that she returned LRN's confidential information to LRN. This is provably false. Philips returned or destroyed all LRN information she received during her employment with LRN. Before leaving LRN, Philips asked LRN's Human Resources representative, Joanna Jose, if she should return to LRN the information she had or destroy it. Ms. Jose told Philips to destroy it and return only her laptop, blackberry and cell phone (if she did not want to take back the cell number personally). Philips destroyed all LRN information in her possession and returned the laptop and blackberry. Ms. Jose was aware of this fact. Further, Philips advised LRN's counsel, by letter dated July 18, 2005, that she had complied with all of her legal and contractual obligations.    (LRN Memorandum, Ex. H). Philips's counsel again advised LRN's counsel of this fact by letter dated July 28, 2005. (LRN Memorandum, Ex. N). LRN's contention otherwise is plainly false.

iii.    *Philips Refused to Sign LRN's Affidavit with Good Reason.*

Lastly, LRN relies upon Philips's refusal to sign an affidavit, prepared by LRN's counsel, to support its contention that Philips is misappropriating its trade secrets and confidential information. LRN does not cite to any contractual or legal obligation Philips had to sign such an affidavit.

Philips refused to sign the affidavit for many valid reasons. First, the affidavit stated or implied that Philips was violating her agreements with LRN; misappropriating LRN's trade secrets; soliciting LRN employees; in possession of LRN's confidential information; making representations about LRN's business operations, personnel and employment policies, strategies, revenues, employee turnover, compensation and benefits and business practices; making false or disparaging comments about LRN; and, interfering with LRN's relationships with its clients.

Because Philips was doing none of these things, to sign an affidavit stating or implying that she was would have been false. Philips responded to the demand for the affidavit, twice (once through counsel), advising LRN's counsel that she was not violating her legal or contractual obligations to LRN. Despite these statements, LRN's counsel, incredibly, persisted in demanding that she sign the affidavit, knowing that it would be false.[2]

Philips did not sign the Affidavit that was proposed by LRN's counsel because she already signed confidentiality and trade secrets agreements and was in compliance with all of her obligations under those agreements. The affidavit also demanded that Philips confirm that she would "cease making representations about LRN's ... employee turnover" and "cease making any negative, untruthful or disparaging remarks about LRN, its' business practices, or its' treatment of me as an employee or its' treatment of any other current or former LRN employee." While Philips has not said negative things about LRN's turnover or management practices to potential customers, she has no obligation to refrain from doing so. Despite the fact that Philips has revealed no information, protected or otherwise, LRN's motivation to secure the affidavit is a transparent attempt to keep Philips from revealing LRN's high employee turnover, low employee morale, mistreatment of women and non-management employees, and inability to deliver quality products on time. Further, Siedman was apparently demanding the affidavit to assuage his embarrassment over the fact that Philips and Ms. Moriarty went to work for a competitor.

Thus, the only facts before the Court reveal that Philips has neither used, nor threatened to use, any of LRN's trade secrets or confidential information. Philips understandably did not reveal she was going to work for a competitor, given LRN's past behavior with respect to departing employees. Philips made arrangements to, and did, destroy or return all confidential

---

[2] Under District of Columbia law, the solicitation of a false affidavit is a felony. D.C. Code § 22-2402

information to LRN. And Philips refused to sign an affidavit that falsely stated that she had violated her contract, misappropriated LRN's trade secrets, and which sought to impose new and broader obligations upon her. Thus, LRN's "evidence" is baseless on its face.

2.    **LRN's Apparent Legal Theory Has Been Expressly Rejected Under California Law**

Importantly, LRN's apparent legal theory has been expressly and repeatedly rejected by California courts. LRN posits that because Philips was formerly employed by LRN and now works for a competitor, she necessarily must be using or threatening to use its trade secrets. Under such a theory, every employee who acquired any arguably proprietary information during the course of employment could be deemed a "threat." This is known as the "inevitable disclosure doctrine."

The inevitable disclosure doctrine is not recognized under the law of California. See Whyte v. Schlage Lock Co., 101 Cal. App. 4th 1443, 125 Cal. Rptr. 2d 277 (2002). In Whyte, Whyte was Schlage's vice-president of sales. Whyte signed an agreement restricting his use of Schlage's confidential and proprietary information. In his capacity as vice president of sales, Whyte participated in the negotiation of an arrangement with Home Depot to provide greater shelf space to Schlage's products, to the detriment of Schlage's competitor, Kwikset.

Kwikset then offered Whyte a job. Whyte accepted the position with Kwikset, but continued talks with Home Depot on behalf of Schlage before announcing his resignation. When Whyte assumed virtually identical duties for Kwikset, Schlage sought injunctive relief. In seeking to enjoin Whyte from actual or threatened misappropriation of its trade secrets, Schlage presented evidence that Whyte had access to its trade secrets; vowed to get even with its president; concealed his planned departure from Schlage; renounced his confidentiality agreement; lied about destroying Schlage's confidential information; retained a copy of

19

Schlage's agreement with Home Depot; and accepted a position with a competitor, with identical duties. The trial court found under these facts (which were disputed), that Whyte should not be enjoined.

On appeal, Schlage relied, in part, upon the inevitable disclosure doctrine, under which "a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." Whyte, 101 Cal. App. 4th at 1458, 125 Cal Rptr. 2d at 290 (citing PepsiCo, Inc. v. Redmond, 54 F.3d 1262, 1269 (7th Cir. 1995)). In affirming the trial court's refusal to enter an injunction, the California Court of Appeals rejected the doctrine under California law, pointing out that under California law, covenants not to compete are generally forbidden. See id. at 1462, 125 Cal. Rptr. at 292; Cal. Bus. & Prof. Code § 16600. Given the policy against enforcing noncompetition agreements, the Court found that applying the inevitable disclosure doctrine would amount to an after-the-fact amendment to the parties' employment agreement, imposing a *de facto* covenant not to compete.

LRN presents a case far less persuasive than Schlage did. Philips did not renounce her confidentiality agreement. In fact, she assured LRN twice that she had and would continue to honor it. Philips has never lied about her possession of LRN's confidential information. Indeed, despite LRN's insistence that she do so by signing the false affidavit, Philips affirmatively refused to lie. And Philips retained no documents or contracts belonging to LRN. If Schlage was not entitled to injunctive relief in Whyte, LRN most assuredly is not entitled to such relief here.

Similarly, in Bayer Corp. v. Roche Molecular Systems, Inc., 72 F. Supp. 2d 1111 (N.D. Cal. 1999), a drug company which had formerly employed a marketing manager was not entitled

to a preliminary injunction preventing new employer's misappropriation of trade secrets absent

showing of likelihood that it would be able to prove actual or threatened use or disclosure, as

required to prevail on merits under California law.    In light of California policy favoring

employee mobility, a mere theory of inevitable disclosure, without evidence of manager's intent

disclose secrets, was not sufficient. See id. As the Court stated in Bayer:

> This motion for a preliminary injunction presents a conflict
> between two strong public policies of California-the policy
> favoring employee mobility free of encumbering restriction and the
> policy favoring protection of genuine trade secrets. On the present
> record, the Court concludes that employee mobility must prevail
> and denies plaintiff's motion to prohibit a former employee from
> pursuing his trade at a competitor. The theory of "inevitable
> disclosure" is not the law in California and, at trial, plaintiff will
> have to demonstrate actual use or disclosure, or actual threat
> thereof. For the purposes of a preliminary injunction, under
> California law, the theory of inevitable disclosure does not supply
> the proof needed to establish a probability of success on the merits
> nor does it suffice to raise serious questions about actual use or
> threat.

Id. at 1120.

This is precisely the case before the Court in the case at bar.  LRN has presented not a

scintilla of evidence that Philips has misappropriated its trade secrets or other confidential

information.  Its case depends solely upon Philips's refusal to agree to additional restrictions,

refusal to sign LRN's affidavit that falsely states that Philips misappropriated its trade secrets,

and LRN's contention, despite Philips's repeated statements otherwise, that Philips will not

provide it with "assurances" that she has returned its proprietary documents.  Simply put, LRN is

requesting this Court to infer misappropriation solely on the basis that Philips is working for a

competitor.  This is not permitted under California law.

LRN cites to Ancora Capital & Mgt. Group v. Gray, 55 Fed. Appx. 111, 2003 U.S. App.

LEXIS 56 (4th Cir. 2003).  This case is inapposite.  In Ancora, the defendant was subject to a

noncompete agreement, enforceable under Maryland law. As such, the court found that the violation of the noncompete agreement in conjunction with the assumed trade secrets violation was enough to enforce, at least preliminarily, the noncompete agreement. As such noncompete agreements are prohibited under California law, this case is irrelevant.

**C.      LRN Can Show No Irreparable Injury and Has an Adequate Remedy At Law**

As a general rule, proof of irreparable harm is absolutely essential to the award of injunctive relief. See Wisconsin Gas Co. v. Fed. Regulatory Comm'n, 758 F.2d 669, 674 (D.C. Cir. 1985). See also Bradlees Tidewater, Inc. v. Walnut Hill Inv. Inc., 239 Va. 468, 391 S.E.2d 304 (1990). Completely absent from LRN's memorandum is any explanation of its claim that it will suffer an irreparable injury if the preliminary injunction is denied. There is no factual basis for any allegation that Philips has removed, used or threatens to use any trade secrets or confidential information of LRN. Thus, LRN can show no irreparable harm.

**D.      Philips Will Suffer Irreparable Harm**

LRN's assertion that a preliminary injunction will merely require Philips to do what she agreed to do ignores the fact that LRN has provided no evidence of misappropriation to warrant an injunction against Philips regarding confidential information. The suggestion that LRN should be afforded a fishing expedition of Philips's new employer is without any authority whatsoever. Philips has provided a sworn affidavit that she has complied with all of her legal and contractual obligations and that she has gone to great lengths to avoid even the appearance of impropriety with respect to LRN's information, protected and otherwise.

Philips is engaged in the ethics industry. She would suffer great harm if the Court were to enter an injunction against her, prohibiting her from doing something she has not done. The mere existence of an injunction would give the Courts imprimature to the contention that Philips

acted improperly with respect to LRN's information.  There is no evidence that she did so – indeed, the only evidence before the Court is that she did not do so.  The stain of an injunction, which would imply that Philips acted unethically, would permanently, severely, and irreparably harm Philips in the ethics industry, where she makes her living.

### E.     Public Policy Does Not Favor Unsubstantiated Claims of Breach of Confidentiality

To grant an injunction on LRN's baseless allegations of trade secret misappropriation, in which LRN cannot identify a single trade secret or item of confidential information that has been misappropriated, would require this Court to extend its extraordinary power to issue injunctions to prohibit non-existent violations.  It would require this Court to extend coverage of trade secrets law to every employee who, in the course of his or her employment, comes into contact with confidential information, as every such employee "might" disclose it.  To do so would plainly violate the public policy generally against restraints on trade.

### IV

### Conclusion

LRN has a heavy burden of proof to justify this Court's use of the drastic measure of a preliminary injunction.  The facts do not support any likelihood of success for LRN, as it cannot identify what it is that Philips has done.  At best, and to be generous, LRN's case is doubtful, as there is no evidence of any misappropriation of any trade secrets.  Consequently, it must show a great disparity between harm to it if an injunction is not granted and harm to Philips if an injunction is granted.  This clearly it cannot do.  The motion must be denied.

**A. MERRILL PHILIPS**
By Counsel

**NEWBERG & WINTERS LLP**
8300 Boone Boulevard
Suite 500
Vienna, Virginia  22182
(703) 714-9530
Facsimile (703) 991-4516


By:  _____
    Brad R. Newberg (D.C. Bar No. 467898)
    Christopher Winters (D.C. Bar No. 461454)
    Counsel for Philips


Of Counsel:

Rodney G. Leffler
Timothy B. Hyland
LEFFLER & HYLAND
A Professional Corporation
4163 Chain Bridge Road
Fairfax, Virginia   22030-4102
(703) 293-9300
Facsimile  (703) 293-9301

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of this Memorandum in Opposition to Motion for

Preliminary Injunction was hand delivered this 9th day of September, 2005, to:

> Michelle L. Schaefer, Esquire
> Roxanne Sokolove Marenberg, Esquire
> DLA PIPER RUDNICK GRAY CARY US LLP
> 1200 19th Street, N.W.
> Washington, D.C.  20036

_Brad R. Newberg_

Brad R. Newberg