## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LRN CORPORATION       )
      )
        Plaintiff,       )
      )
v.       )     Case No. 1:05CV01652
      )     Judge: Emmet G. Sullivan
A. MERRILL PHILIPS       )
      )
        Defendant.       )

### DECLARATION OF A. MERRILL PHILIPS

PURSUANT TO 28 U.S.C § 1746, under penalty of perjury, A. Merrill Philips declares as follows:

#### I Have Done Nothing Wrong and Do Not Intend to Do Anything Wrong

1.      I have not used or disclosed any confidential information or trade secrets belonging to LRN and do not intend to do so. In fact, I have taken extraordinary means to ensure that I am in compliance with my legal obligations and taken measures to avoid even the appearance of impropriety. I consulted legal counsel before leaving LRN and joining Midi. In addition, I signed an agreement with Midi stating that I would not use any information belonging to LRN.

Further, and most important, after hearing that LRN had accused me of wrongdoing, I asked Jeff London, a lawyer from Chicago to assure LRN that I had done nothing wrong and to demand any evidence LRN had to the contrary. To that end, Mr. London wrote LRN's counsel on July 28, 2005, attached hereto as *Exhibit A.* To my knowledge, LRN never responded to Mr. London's letter.

1

2.      Further, even though LRN pricing, contract terms, business strategies and other information LRN now cites as confidential were openly provided to current and former LRN clients and prospects, I have not discussed this kind of information with anyone, including my current employer.

### I Do Not Have In My Possession and Do Not Intend to Use LRN Confidential Information or Trade Secrets

3.      I have returned or destroyed all LRN information I received during my employment with LRN.  Before leaving LRN, I asked LRN's Human Resources representative, Joanna Jose, if I should return to LRN the information I had or destroy it.  Ms. Jose told me to destroy it and return only my laptop, blackberry and cell phone (if I did not want to take back the cell number personally).  I destroyed all LRN information I had in my possession and returned my laptop, blackberry and cell phone.  I have not used the cell phone number I was using at LRN since leaving.

4.      The General Counsel and executive contact information that LRN now claims is trade secret and/or proprietary information is publicly available information, available on the Internet.  Even so, I neither have used nor will use any LRN customer or contact lists.

5.      Much of the information that LRN now claims is confidential is: (a) routinely given out in presentations, (b) discussed in conversations with prospects and customers without non disclosure agreements or other protections in place and/or (c) revealed by customers and prospects of LRN.  Even so, I have not disclosed any LRN confidential or proprietary information to anyone.

6.      I do not have sufficient knowledge of LRN pricing to use it even if I wanted to. LRN's pricing structure seemed very complex, changed frequently and was applied inconsistently.  As a result, I almost always obtained pricing for a particular situation

(customer/prospect and facts) from LRN Sales Operations or management. I never used a price list to do pricing for customers and rarely had any involvement in setting pricing. In any event, I have not disclosed and would not disclose any LRN pricing information.

7.      The "best practices compilations" LRN now claims are confidential were routinely set forth in public presentations and marketing materials (e.g. Ethics Officer Association meetings, Webinars, etc.). Some, if not all, of these "best practices" are also available on LRN's public Internet site. Further, many other organizations and individuals in the ethics and compliance area promote the same practices.

### LRN Did Not Take Strong Efforts to Protect the Information Which It Now Claims Is Confidential

8.      LRN's Affiant, Julie Molleston, has been employed with LRN for approximately 8 months and thus would have very little knowledge of what I did for LRN on a daily basis and almost no knowledge of what information I had in my possession as a result of my position.

9.      In fact, no current LRN manager, except LRN's CEO, Dov Seidman ("Seidman"), would have much institutional knowledge of me personally or company practices regarding the protection and management of the information which LRN now claims as confidential and trade secrets. In the over five years I worked for LRN, the company had at least five different heads of Human Resources and numerous others below them who stayed for usually less than a year. The same is true for almost all other management positions.

10.      Since joining Midi, to avoid even the appearance of impropriety, I have not solicited business from current LRN customers or provided my Midi contact information to them. In addition, I do not attend any meetings with current LRN customers that have been arranged by Midi sales personnel.

11.    Many of the items that LRN states in its Complaint were maintained as confidential, were actually not maintained in that manner during my tenure at the company. For example, LRN's client list was, until recently, published on the Internet and can still be found there on archive Internet sites. A copy of the current partial customer list, printed from LRN's website, is attached hereto as *Exhibit B*. A copy of what purports to be a complete customer list, from an archive of LRN's website as of December 2004, is attached hereto as *Exhibit C*. In addition, LRN routinely issues press releases when it signs on new clients. Much, if not most, of the information identified in the Complaint as confidential was disseminated to the sales organization, published on LRN's Intranet and routinely communicated to current and potential LRN customers.

### LRN Has Made No Allegations of Fact In Its Complaint Because There Can Be None

12.    LRN has alleged no facts in support of its claims because there are none, because I have not engaged in any improper conduct.

13.    I am offended by LRN's allegation that I may have used or intend to use confidential information. I left LRN over five months ago and have not used or disclosed any LRN confidential information to date. There is no reason for LRN to think that I may do so in the future.

### There Was No Legitimate Reason for Me to Sign LRN's Proposed Affidavit

14.    I did not sign the Affidavit that was proposed by LRN's attorneys because I had already signed confidentiality and trade secrets agreements and was in compliance with all of my obligations under those agreements. Further, and more important, the proposed Affidavit implied that I had done, or intended to do, something wrong. I have not done anything wrong and will not sign something that implies that I have.

4

15.    Interestingly, the affidavit also asked that I confirm that I would "cease making representations about LRN's...employee turnover" and "cease making any negative, untruthful or disparaging remarks about LRN, its' business practices, or its' treatment of me as an employee or its' treatment of any other current or former LRN employee." While I do not say negative things about LRN's turnover or management practices to potential customers, I have no obligation to refrain from doing so. This demand is nothing but a transparent attempt by LRN to stifle information about the company's high employee turnover, low morale and poor management.

### I Had No Obligation To Tell LRN That I Was Joining Midi and Did Not Disclose My New Employment Status For Valid Reasons

16.    LRN's poor treatment of me and other current and former LRN employees - including Seidman's public, derogatory comments about current and former employees —made me conclude that Seidman would harass and defame me if he knew I was joining a competitor. The fact that, without any foundation, LRN has now sued me and another former employee, Julie K. Moriarty ("Ms. Moriarty"), for the supposed use of confidential information – without any evidence of wrongdoing – demonstrates that LRN is willing to use any means, including a frivolous law suit, to personally hurt and defame Ms. Moriarty and me.

17.    Seidman and LRN management have a history of publicly making derogatory and/or untrue statements about people who leave the company. For example, a few years ago, a senior manager at LRN sent an email to the entire sales and services organizations saying that an LRN sales person, Tom Sullivan, had been fired, when he had actually resigned. When Seidman received objections to the message from a number of people as being grossly inappropriate, particularly for a company in our business - no retraction or apology was ever made. LRN has

also publicly announced (in company-wide town halls, voice mails, memos, etc.) the firing of certain individuals and the reasons for their termination.

18.     My concerns about what Seidman would do when he found out I had joined a competitor were realized soon after he became aware I was with Midi. I have been told by a number of LRN employees that he recently made derogatory statements about Ms. Moriarty and me in LRN meetings with large numbers of employees present. I am very concerned that Seidman is making these comments in the business community, which could ruin my reputation and ability to earn a living in the ethics and compliance field, which is relatively small. While LRN loses an abnormally high portion of its employees every year, I believe that Ms. Moriarty and I are the first LRN employees to go directly to a competitor. This was particularly surprising to me given that many of my LRN colleagues were very talented and told me how committed they were to the ethics and compliance industry. I believe that one of the main reasons for this phenomenon is that LRN employees are afraid of Seidman and what he could do to their reputations and ability to earn a living.

19.     By way of example, one former LRN sales executive, Julie Angevine, left LRN for an E-Learning company, SkillSoft, which did not specialize in the ethics and compliance training field. Even though LRN did not consider SkillSoft a competitor, Seidman sent Angevine and the CEO of SkillSoft letters threatening litigation if Angevine worked for SkillSoft. Angevine lost her job with SkillSoft shortly thereafter.

20.     As one of the longest tenured employees LRN ever had, I did not decide to leave lightly. I believe my reasons for leaving LRN were as valid as my desire to continue to earn a living in the ethics and compliance arena.

<u>LRN's Concern Is Not Disclosure of the Information Which LRN Claims Is confidential, But
Disclosure of Its Poor Management Practices and Company Culture</u>

21.    I had no choice but to leave LRN because I could no longer tolerate selling

programs designed to teach ethics and compliance from such an unethical company.  This suit

and LRN's attempts to make me sign the affidavit included in it were attempts to ensure that the

information below does not become public.

a.    <u>LRN has extremely high employee turnover.</u>  LRN's employee turnover

rate is reported to be at least 50% for the past several years.  Increasingly, current and potential

customers were raising their concerns about LRN's turnover rate, in part because an LRN

competitor (not Midi) was raising LRN's turnover rate with potential clients as a sales tactic.  I

did not feel that I could ethically represent that employee turnover was not a problem and would

not be a problem for any customer selecting LRN.  LRN represented itself to the public as being

the most experienced provider when in fact the extreme turnover meant that, frequently, the

people who were actually supporting customers (course development, technology, services) were

very inexperienced.

LRN's general employee population, my peer group at LRN and LRN's senior

management were all in constant flux.  For example, in the last six months, LRN's Executive

Vice President and Chief Financial Officer, its Executive Vice President and Chief Operations

Officer, as well as its' Vice President of Marketing have resigned from LRN.  During my tenure

with LRN, there were at least four Chief Financial Officers and four Chief Technology Officers.

This turnover has had a significant impact on the company's operations and ability to support its

clients.

b.    <u>Employee morale at LRN was extremely low.</u>  LRN's poor employee

morale was partially caused by, and helped contribute to, additional turnover.  Employees felt

that expectations of them were unrealistic, they were grossly overworked, underpaid for what they did, and further had little chance for upward mobility.

LRN recognized these problems and at least twice while I was with the company hired consultants to conduct "confidential" interviews of employees. I was told that when employee concerns were raised with Seidman, he demanded to know who was responsible for making the complaints. The atmosphere at LRN of repression and fear made it difficult for me to represent to potential clients that LRN had the same values they did.

c.    LRN has an extremely poor success record for women in management. A large percentage of female managers at LRN lasted less than a year with the company. In addition, one of LRN's sales executives, Donna Culver, who is one of the longest tenured members of the sales force, complained to me repeatedly that she did most of the work on accounts for many of the male sales executives out in the field, but made significantly less on commissions and total salary than her male counterparts. The poor success rate for women in the company made it difficult for me to promote LRN to potential clients and employees.

d. There was a general atmosphere of distrust of management throughout LRN. Ms. Molleston's affidavit states that LRN's customers' values "mirror [LRN's] own." In my experience, this is not true. For example, LRN withheld or reduced commissions due to current employees, and wages, vacation pay, expense payments and commissions due to employees who resigned.

One former LRN sales person, Scott Schneider, had to sue LRN to obtain commissions due to him. In addition, when Schneider gave notice that he was leaving LRN, he was told that his salary had been lowered – without any notice to him – six months prior and that the adjustment was going to be made retroactively. When Schneider told LRN that he had never

been given notice of the salary reduction, he was told that if he did not accept the retroactive salary reduction LRN would dock the back vacation pay due to him to make up for it.  At least two former LRN employees refused to carry out the retroactive salary request.  Other former sales people told me that they believed that they were entitled to commissions like Scott Schneider but that they were too afraid to assert their claims for fear of Seidman trying to ruin their reputations.

LRN also tried to reduce commissions due to sales people after deals were closed. For example, Brenda Murphy, an LRN sales person in Chicago, told me that she was surprised to find after she closed the Abbott Laboratories deal that she would not be paid commissions on the account.  She said she was told that the account had closed largely due to Seidman's relationship with Abbott's general counsel.  Ms. Murphy complained about the decision and I later heard LRN management make negative comments about her.  Ms. Murphy was fired thereafter.

LRN had poor practices of managing employee compensation and repeatedly delayed dates for paying year end bonuses.  For example, bonuses for 2004 were not paid until the end of March in 2005.  In at least 2003 and 2004, I did not receive my compensation plans until 4-6 months into the year for which the plan was developed, i.e. retroactively.  I wrote a point by point memorandum regarding my compensation plan in 2003 (that I received retroactively, e.g. many months into the year), asking for reconsideration of certain provisions not shared by other salespeople, I was told by the Head of Sales at the time, Jim Blackic, that I had wasted my time writing the memorandum because they would not even consider my feedback.

e.    LRN had problems developing reliable products and delivering products on time.  I had significant concerns about LRN's ability to successfully deliver any new product,

9

including its new suite of products for the Governance and Ethics Management System (GEMS). Frequently, when LRN delivered a new or enhanced product, it was late and there were major problems with it.

LRN had significant technical problems when it launched its flagship Legal Compliance and Ethics Center (LCEC) product. The product had many weaknesses, problems with reporting and tracking as well as problems with the quality of the content of its courses. There were also significant problems with the new version when it came out.

In the role that I was given at LRN at the beginning of 2005, I was to be responsible for helping the assigned Senior Knowledge Services Executive manage the rollout of LRN's Governance and Ethics Management System (GEMS), a suite of products that help companies manage their entire ethics and compliance programs, to two of its charter subscribers. From my perspective, the product was/is being developed and sold with very little planning. Given my history with LRN's technology and the importance of the functions that GEMS would be handling, I did not feel that LRN could deliver the products successfully. I was concerned that I might harm my personal reputation being associated with promoting it and did not feel that I could ethically do so, given how the initiative had been managed to date.

### This Suit Is a Personal Vendetta by Dov Seidman Because He Is Embarrassed That I Went To a Competitor

21.     As indicated by the lack of factual bases for this action, I believe that LRN knows that I do not have, and am not using any of the information which LRN claims is confidential or trade secrets. I believe that the sole basis for this suit is a personal agenda by Seidman. I was told that Seidman recently stated to a large group of LRN employees that, while he expected that former LRN employees would go to competitors, he took it personally that Ms. Moriarty and I did so and considered it a "personal betrayal." I have also been told that Seidman stated in front

of a large group of LRN employees that Ms. Moriarty and I were unethical simply because we went to a competitor, even though we had a right to do so.

PURSUANT TO 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed at Washington, D.C. this _____8th_____ day of September, 2005.

A. Merrill Philips

11

Sachnoff & Weaver, Ltd.
10 South Wacker Drive
Chicago, Illinois 60606-7507
t 312 207 1000  f 312 207 6400
www.sachnoff.com

Jeffrey L. London
Attorney at Law
t 312 207 3878
jlondon@sachnoff.com

Sachnoff&Weaver 🐾

July 28, 2005

**VIA OVERNIGHT DELIVERY**

Jon D. Meer
DLA Piper Rudnick Gray Cary US LLP
1999 Avenue of the Stars, Fourth Floor
Los Angeles, CA 90067-6022

       Re:    *LRN*

Dear Jon:

      As a follow-up to our telephone conversation last week, and on behalf of Midi, Inc., Merrill Philips and Julie Moriarty, I wanted to confirm that Merrill and Julie, as a condition of their employment with Midi, Inc., agreed in writing that, during the period of their employment with Midi, they would not: "improperly use or disclose any confidential information or trade secrets, if any, of any former employer or any other person to whom I have any obligation of confidentiality, and I will not bring on to the premises of the Company any unpublished documents or any property belonging to any former employer or any other person to whom I have an obligation of confidentiality unless consented to in writing by that former employer or person."

      Further, both Merrill and Julie have also been directed in writing that they are to "treat all confidential information that [they] obtained during the course of [their] employment with LRN as confidential and that [they] do not disclose any such information to any employee of, consultant to, or individual affiliated with, Midi."

      Merrill and Julie have reviewed this letter to you, understand their obligations and are acting in accordance with such obligations.

      We trust that this letter is sufficient to allay any concerns that LRN may have with respect to the conduct of Merrill, Julie or Midi. If, at any time, LRN has a factual basis to support its position that either Merrill or Julie are in violation of this non-disclosure provision, we encourage LRN to provide us with some substantive support for such a basis and Midi will promptly investigate it. Rest assured, however, that Midi, Merrill and Julie

**EXHIBIT**

A

Jon D. Meer
July 28, 2005
Page 2

Sachnoff&Weaver 🐌

will seek all appropriate remedies, including sanctions, if applicable, should LRN file any cause of action against any or all of them based upon unsupported and unsubstantiated allegations.

Very truly yours,

Jeffrey L. London
for SACHNOFF & WEAVER, LTD.

JLL/cap



LRN

SEARCH LRN

Customer
Community

Testimonials

Case Studies

Perspectives

TAKE ME TO THE LIBRARY

White Papers

Government Affairs

Research Projects

CONTACT US
For more information

# Customer Community

LRN is proud that some of the world's leading companies have elected to partner with us in a shared mission to achieve the highest standards of ethical health and legal compliance.



Figure 2

The LRN community comprises companies of all sizes and industries, but they have one thing in common—an unwavering commitment to living up to the expectations of their employees, customers, suppliers, and shareholders.

Figure 1

Our customers have the opportunity to join multiple collaborative forums throughout the year—at our annual KnowledgeForum, our Regional and Industry KnowledgeForums, and our KnowledgeCamps, and through our Ethics and Compliance Webinar series—to share best practices and learn from each other.



Figure 3



Figure 4

Learn how the power of our unique customer community makes it easier to advance the goals of your ethics and compliance program.

PARTIAL CUSTOMER LIST


Adecco

Abbott Laboratories
Agilent
BASF
Bridgestone
Computer Associates
ConocoPhillips
Dean Foods
Diageo
The Dow Chemical Company
DuPont
Hoffman-LaRoche
Honeywell
Intel/Digital
Johnson & Johnson
MCI
Pfizer
PMI
P&G
TYCO
Viacom
The Walt Disney Company
The Wrigley Company



LRN


EXHIBIT
B

# LRN

Solutions     About LRN     LRN News     Cor

3M
Abbott Laboratories
Advanced Micro Devices (AMD)
AEGON Insurance Group
Agilent Technologies, Inc.
AutoNation, Inc.
BAE Systems
Baker Hughes
BASF Corporation
Boehringer Ingelheim
Pharmaceuticals, Inc.
Boeing
BP
Bridgestone
Brunswick Corporation
Canon USA
Caterpillar Inc.
Centex
CITGO
Citrix Systems, Inc.
CMS Energy
Commonwealth Industries, Inc.
ConocoPhillips
Cooper Cameron
Credit Suisse First Boston
Crompton Corporation
Dade Behring
Dean Foods Company
Diageo North America, Inc.
Disney
The Dow Chemical Company
DuPont
Eaton Corporation
Energen
E.piphany
EPRI
Equiva
Exelon
FactSet Research Systems Inc
FMC Corporation
Ford Motor Company
Formosa Plastics Corporation,
U.S.A.
Fujisawa Healthcare, Inc.
GATX Corporation
General Mills
Genzyme
Goodrich Corporation
Hartford Fire Insurance Company
Hoffmann-La Roche Inc.
Honeywell International Inc
Illinois Tool Works Inc.
Independence Blue Cross
InterDigital Communications

Over 100 leading companies have joined the community of customers v
have entrusted LRN to foster the highest standards legal compliance ar
ethics. We can configure appropriate programs that meet the needs of
middle-market cost-effectively, and design comprehensive solutions me
the diverse requirements of the most complex Fortune 100 global
organizations.

Find out how the LRN suite of products and services has addressed the
compliance and ethics awareness education needs of companies throu
the globe.

| | |
|---|---|
| CONOCOPHILLIPS | Following the merger of Conoco and Phillips Petroleum, company embarked on a comprehensive strategic initiati make all employees aware of the myriad of legal and ethi that they face while on the job. An integral part of the pro web-based education in legal, compliance and business through the LRN LCEC – referred to by employees as ConocoPhillips Law School. To gain buy-in, the company developed an internal marketing campaign to engage em in the training. This campaign even created a mascot, the Shark' to signify that the company is serious about taking out of legal liabilities, and will make a significant investm shore up education and awareness in these critical areas 10,000 employees received a shark collectible and the ca helped to significantly increase employee awareness and participation. |
| DUPONT | DuPont implemented a Six Sigma quality study to exami alternative means of managing the creation and dissemi legal research. The study revealed that the work perform LRN offered a significant savings over traditional sources importantly, the study revealed that the savings came wi sacrifice in work quality. Based on these findings. DuPon LRN to be a member of the DuPont Legal Model, and is primary service provider of legal research for DuPont and outside legal counsel. |
| JOHNSON & JOHNSON | In the middle of 1999, J&J became one of the first Charte Subscribers to the LRN LCEC. Since that time, LCEC ha an integral part of the company's effective compliance pr and the company recently significantly expanded its relat with LRN. The LRN – J & J partnership enables the comp track and document results, and ensu complete the courses and achieve a br issues covered. |

**EXHIBIT**

C

Corporation
Johnson & Johnson
Johnson Controls. Inc.
J.P. Morgan Securities Inc.
Kennametal Inc.
Kennecott
KLA-Tencor Corporation
Koch Industries
Lucent Technologies Inc.
LVMH
MDU Resources Group. Inc.
MetLife
MITRE Corporation
Mitsubishi Motor Sales of America
Morgan Stanley
Motorola, Inc.
Neiman Marcus
Network Associates
New York City Council
NiSource
Noveon, Inc.
Oglebay Norton Co.
Panasonic
Pfizer Inc.
PMI Mortgage Insurance Co.
PotashCorp
Potomac Electric Power Company
(PEPCO)
Praxair, Inc.
Procter & Gamble
Purdue Pharma
Raytheon Company
Reckitt Benckiser
Reed Smith
Reliant Resources
Rhodia
Rio Tinto
Roche Diagnostics
Rohm & Haas Company
Ryerson Tull
Sara Lee Corporation
Scientific-Atlanta, Inc.
Sempra Energy
Serono. Inc.
ServiceMaster
Shell
Siemens Westinghouse
SIRVA
Snap-On
SPX Corporation
Standard Register
TAP Pharmaceutical Products
TECO Energy
Tellabs
Tesoro Petroleum Corporation
Textron Inc.
Toyota
Transocean Sedco Forex Inc
Tyco
United Technologies Corporation
USFilter
U.S. Cellular
The Washington Post Company
Wendy's International, Inc
Wisconsin Energy Corporation
Wyeth
XL Capital

MOTOROLA

LRN also helped establish the J&J Law Center – the cust
implementation of LRN KnowledgeEnvironment. Combini
ethical and legal content with powerful technology. LRN h
achieve its objective of creating a future of security, grow
ethical and legal awareness that will benefit the entire hea
industry.

To help leverage critical human resource talent, Motorola
embraced web-based technology, including the LRN LCE
Motorola recognized LCEC serves as a useful adjunct to
and other professionals in encouraging legal and respons
conduct throughout the world. LCEC has proven itself an
part of the company's effort to emphasize the role of lega
compliance and human resources as a strategic business
to the organization, not simply protection against liability
solver of legal disputes.