1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
LRN CORPORATION,              .   Civil Action No. 1:05cv937
                              .
         Plaintiff,           .
                              .
    vs.                       .   Alexandria, Virginia
                              .   September 30, 2005
JULIE K. MORIARTY,            .   10:00 a.m.
                              .
         Defendant.           .
                              .
. . . . . . . . . . . .
```

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:           ROXANE SOKOLOVE MARENBERG, ESQ.
                             MICHELLE L. SCHAEFER, ESQ.
                             DLA Piper Rudnick Gray Cary US LLP
                             1200 19th Street, N.W.
                             Washington, D.C. 20036-2412


FOR THE DEFENDANT:           TIMOTHY B. HYLAND, ESQ.
                             Leffler & Hyland
                             A Professional Corporation
                             4163 Chain Bridge Road
                             Fairfax, VA 22030-4102


OFFICIAL COURT REPORTER:     ANNELIESE J. THOMSON, RDR, CRR
                             U.S. District Court, Fifth Floor
                             401 Courthouse Square
                             Alexandria, VA 22314
                             (703)299-8595


(Pages 1 - 17)


COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

```
 1                    P R O C E E D I N G S
 2           THE CLERK:  Civil Action 2005-937, LRN Corporation v.
 3  Julia Moriarty.  Will counsel please note their appearance for the
 4  record.
 5           MS. MARENBERG:  Good morning, Your Honor.  Roxane
 6  Sokolove Marenberg for the plaintiff, LRN Corporation.  I've been
 7  admitted pro hac vice in this matter, and with me is my associate,
 8  Michelle Schaefer, who is a member of this Bar.
 9           THE COURT:  Ms. Sokolove, you should just become a
10  member; I'm seeing you so often now.  Think about that.  All
11  right.
12           MS. MARENBERG:  I shall, Your Honor.
13           THE COURT:  And for the defendant?
14           MR. HYLAND:  Good morning, Your Honor.  Tim Hyland for
15  the defendant, Julia Moriarty.
16           THE COURT:  All right, Mr. Hyland.
17           Now, there are two motions before the Court.  The first
18  is Mr. Hyland's motion to dismiss the complaint outright for
19  failure to state a claim, and then we have the plaintiff's motion
20  for preliminary injunction.
21           I actually want to start with the motion to dismiss.
22  Ms. Sokolove, I'm assuming you're going to argue this?
23           MS. MARENBERG:  I am, Your Honor.
24           THE COURT:  All right.  Well, you know, it's
25  interesting, I had a case almost exactly like this a couple of
```

1  weeks ago.  That case actually has settled, but it was the same
2  kind of issue.  It was an issue of a former employer who was
3  bringing a suit against again a former employee alleging breach of
4  a confidentiality agreement, misuse of trade secrets, exact same
5  type of thing and exact same problem existed in that case, and
6  that is, that the plaintiff had not explicitly alleged in the
7  complaint an actual breach of a proprietary information agreement,
8  had not been able to identify a single instance in which, you
9  know, such a violation had occurred, and notice pleading
10 notwithstanding, I think in these types of cases, unless the
11 plaintiff has some specific instance which they can point to of a
12 misuse of a trade secret, it is simply not sufficient that an
13 employee who may have had access to proprietary information and
14 who has gone to work for a competitor is necessarily breaching the
15 agreement.
16         And the problem I have in this case, which is similar to
17 one I had in the other case, is that the affidavits which the
18 plaintiff wanted the defendant to sign were absolutely
19 inappropriate, and I agree with the defendant for not signing it,
20 and yet the defendant is coming forward and is prepared to, as I
21 understand it, enter an affidavit or a statement that she has not
22 and does not intend to use or misuse the information.
23         So I think I'm putting the burden on you, Ms. Sokolove,
24 to come forward and tell the Court if you at this point have any
25 specific information supporting the claim that the defendant has

1  breached these agreements.
2          MS. MARENBERG:  Your Honor, if I might go back to the
3  issue of what is the obligation on the part of a plaintiff under
4  the California Uniform Trade Secrets Act -- and I don't know
5  whether in Your Honor's case that it handled a couple of weeks
6  ago, whether it was Virginia law applying or Virginia Uniform
7  Trade Secrets Act --
8          THE COURT:  It was Virginia, but I don't think the
9  California law is that materially different.
10         MS. MARENBERG:  Well, Your Honor, the significant issue
11 here is that under California law, actual or threatened --
12         THE COURT:  Where's the threat?  A threat would be
13 something like this:  a former employer who says, I'm going to do
14 XYZ.  That's a threat.
15         But simply going to work for a competitor without more
16 cannot be construed as a threat.
17         MS. MARENBERG:  And, Your Honor, we have more.  What we
18 have here in order to establish a threatened misappropriation and
19 what the courts have directed the courts to look to is, as the
20 Court is aware, how do you demonstrate or how do you prove intent
21 absent someone saying, as you have suggested, Your Honor, you
22 know, I am about to go and I threaten I'm about to go and reveal
23 confidential information from LRN?
24         I mean, that is an actual threat, but when you look at
25 the intent of the parties -- or the intent of the defendant in

1  this case, this is what we have, and this is why threatened
2  misappropriation has to have -- has to not be a null set; in other
3  words, there has to be a distinction between actual
4  misappropriation and threatened misappropriation.
5         THE COURT:  Let me give you an example of another one.
6  If the affidavit in a much calmer, nicer letter from counsel --
7  and it wasn't from you, so I'm not criticizing you -- but if the
8  letter sent by the plaintiff had said something like, We're
9  concerned, you've gone to work for a competitor.  As you know,
10 you've had access to this information.  We would feel much more
11 assured if you would file with us a statement under the penalty of
12 perjury that you have not and will not intentionally or whatever,
13 some language softer than that, but yours was a cease and desist,
14 and any reasonable reading of that affidavit that was tendered to
15 this defendant would be concerned because it seemed to suggest
16 quite clearly that there had already been misconduct.
17         So if your next argument was going to be her refusal to
18 sign the affidavit, I don't find that that has any merit given the
19 nature of the affidavit that was submitted to her.
20         MS. MARENBERG:  Well, Your Honor, I think it's important
21 to look at the history here, because this is what goes to the
22 issue of intent that the courts look to in determining whether
23 there's threatened misappropriation, and again, absent any actual
24 misappropriation or a statement, an oral admission by a defendant
25 that he or she is about to misappropriate, the courts are resigned

1  to having to look at what the behavior was and does the behavior
2  on the part of the defendant raise suspicion that there is going
3  to be threatened misappropriation.
4          And what we have here is that we have a highly placed
5  executive at the company.  Ms. Moriarty had been a former
6  executive programs director.  She was toiling at a very small
7  industry, with few competitors, including Midi, who was the chief
8  competitor.  She works for five years for the company, rising to
9  the level of director of knowledge services.
10         The company makes a significant investment in her.  They
11 have a confidential relationship as a result of their putting
12 their trust in her and giving her access to virtually every aspect
13 of their business:  strategy, marketplace identity, access to
14 client contracts, pricing information.  We're so concerned with
15 respect to her access to our confidential information that she
16 signs two nondisclosure agreements in the course of her
17 employment.
18         Five years into her employment, she quietly resigns.
19 What she does is she demonstrates a complete lack of candor and
20 forthrightness to the company that has put its trust in her by
21 never acknowledging where she's going, and, in fact, in response
22 to a direct request to find out where she's going or what she's
23 going to be doing upon leaving LRN, she refuses to provide
24 information, thereby raising suspicion.
25         Is that enough?  Probably not.  Let's go to the next

Case 1:05-cv-01652-EGS    Document 16-2    Filed 10/03/2005    Page 7 of 17

7

1  step.
2          We find out that she's working for the chief competitor
3  by a phone call that's made to our company, to LRN, by a Midi
4  employee soliciting employees to come over and saying that, oh, by
5  the way, Ms. Moriarty works at Midi.
6          I'm not suggesting that she made that call directly or
7  indirectly or it was -- it was made to LRN, but the fact is we now
8  find that Ms. Moriarty is over at Midi. We now understand she
9  heads up the service organization, a much higher position than she
10 held with LRN.
11         So LRN then takes the following steps. It engages
12 counsel, and on July 12, LRN writes a letter to Moriarty alerting
13 her to the fact that it's come to LRN's attention that you may be
14 engaging in behavior that violates your written employment
15 agreements with LRN containing prohibitions on the protection of
16 LRN's trade secrets.
17         Then LRN in that letter asks her to acknowledge in an
18 affidavit that she will cease and desist, and it has other
19 language, that you won't make use of any trade secrets or
20 confidential information, you'll return all documents, and asks
21 her to cease and desist making disparaging remarks.
22         She refuses to acknowledge compliance with her
23 nondisclosure agreements, but most significantly, Your Honor, even
24 if she found that affidavit overreaching, I'm not conceding that
25 it is, but if she were to have found that was overreaching, she

 1  failed to suggest that she would sign some language that she found
 2  not offensive.  She failed to suggest alternative language.
 3          So she leaves LRN in a position not knowing whether this
 4  suspicious behavior based on her leaving is enough to get --
 5  establish threatened misappropriation.  So then LRN sends a
 6  letter.  She responds.  She says she's simply complying or intends
 7  to comply with her obligations.  That's just a letter from her.
 8          So LRN, it's insufficient because it's not under oath.
 9  It gives the inadequate assurances of compliance.  It's not --
10  doesn't have the force of law.  So LRN sends another letter to her
11  two days later on July 20 asking her to explain why in her letter
12  of July 18 -- explaining why it's insufficient and asking her for
13  an affidavit.
14          On July 25, LRN sends yet another letter to Ms. Moriarty
15  asking for a signed affidavit attesting to her understanding of
16  the nondisclosure agreements and her obligations under those in
17  order to avoid litigation.
18          And then on the 28th, three days later, a lawyer's
19  letter comes to LRN on behalf of the company for which
20  Ms. Moriarty is working and Moriarty -- Ms. Moriarty, saying she
21  won't sign an affidavit.
22          So then it leaves the company with two alternatives, and
23  the Court's addressed them.  One is we walk away.  LRN says, You
24  know what?  We'll have to take the word of the lawyer and the
25  unattested word in a letter from Ms. Moriarty to support the fact

1   that she's complying with her nondisclosure agreements,
2   notwithstanding the fact that its suspicion is raised based on her
3   behavior at the time she left the company.
4       The alternative for LRN, the alternative to walking away
5   at that point is to file a preliminary injunction seeking a
6   judicially enforceable affidavit or declaration from Ms. Moriarty
7   saying that she's in compliance and that notwithstanding the
8   suspicious behavior in which she's engaged by failing -- by her
9   nondisclosure, her lack of candor at the time she left, in
10  addition to on three separate occasions refusing to put in an
11  affidavit or declaration form some form of assurance, even if she
12  didn't like the language that we proposed, some form of assurance
13  that she's in compliance with the nondisclosure agreements that
14  she reached with LRN during her employment.
15      So we are in a position where without affirmance of
16  compliance that has the force of law, which is an agreed-upon
17  order which, Your Honor, we've proposed, we have with us today,
18  putting an affidavit in the language of the representation she
19  made without -- which she claims is the offending language about
20  disparaging remarks or the cease and desist.
21      But without -- absent walking away, what we're left with
22  is a company that has nondisclosure agreements that she admits are
23  viable and enforceable in filing for a preliminary injunction.  I
24  mean, there's no question, Your Honor, that the issues here
25  pertain to trade secrets, and I'm not going to address that issue

10

1 unless the Court finds that --
2          THE COURT: Let me hear from Mr. Hyland.
3      Mr. Hyland?
4          MR. HYLAND: I'll be very brief, Your Honor.
5 Ms. Sokolove just stated that Ms. Moriarty refused to acknowledge
6 compliance with her obligations. Let me just walk through what
7 the facts are as alleged. Since we're on motion to dismiss, I
8 won't even get into the affidavits here.
9          Even taking their allegations as a given, they wrote a
10 letter with the affidavit that Your Honor acknowledged was an
11 outrageous suggestion that she would ever sign it. Ms. Moriarty
12 promptly responded to that letter, and she said, I've consulted
13 with counsel, and I'm aware of my obligations under my agreements.
14 I'm aware of my obligations under the statutory law. I'm aware of
15 my obligations under the common law. I am complying with them. I
16 intend to continue to comply with them.
17          Then a letter came back from counsel for LRN, and it
18 didn't say, well, propose some other language or sign some
19 affidavit that's okay from you. It said, the letter from counsel
20 for LRN, You either sign our letter or our affidavit, or we're
21 suing you.
22          And then two days after that, he sent another letter
23 saying, You didn't respond to my letter from two days ago. If you
24 don't sign our affidavit, I'm suing you.
25          At that point, Ms. Moriarty's counsel, who is also

1  Midi's counsel, her current -- her now current employer, sent a
2  letter saying, Incidentally, Ms. Moriarty is not violating her
3  obligations, and by the way, Ms. Moriarty as a condition of her
4  employment with Midi has signed an agreement saying she won't use
5  your trade secrets or confidences, and so if you have information
6  otherwise, hey, let us know, because Midi wants to investigate,
7  because we won't tolerate it.
8        How much more assurance do they want than that?  She's
9  not obligated to give them sworn statements under oath.  She was
10 not obligated to give them what she gave them, but she did.  She
11 gave them assurances not once, twice, and if you include her
12 agreement with Midi, three times.  They have every assurance in
13 the world, and this is just a rather cynical attempt to slur
14 Ms. Moriarty, and it's unfortunate.
15       You see the -- they refer to lack of candor.  Not once
16 did Ms. Moriarty lie to them, and they have never -- they talk
17 about lack of candor and all this sort of thing.  She never lied.
18 In fact, the only lie she would have ever committed would have
19 been to sign the affidavit that they were demanding saying that
20 she had violated.
21       So we would suggest there's absolutely no evidence here.
22 There's no -- not sufficient allegations to state a claim.  If
23 this states a claim for trade secrets violation or confidentiality
24 agreement violation, every employee, every employee of virtually
25 every employer out there could be sued, because anybody could

 1  potentially not abide by what they've promised to do.
 2          That's all we have.  Thank you.
 3          THE COURT:  Did you show the proposed order to opposing
 4  counsel?  I hope you have a copy for the Court.  Let's just
 5  look -- I want to see what this looks like.
 6          MS. MARENBERG:  Your Honor, I can represent that this
 7  proposed consent order tracks the language in the nondisclosure
 8  agreement and does not include any of the offensive language that
 9  Ms. Moriarty found to be violative of her obligations.
10          I want to just add a couple of points.
11          THE COURT:  Well, why would an affidavit that simply
12  says, you know, I hereby affirm that I have not in the past nor do
13  I intend in the future to violate any of the agreements I have
14  with my former employer, something loosely like that, why would
15  that not be sufficient?
16          MS. MARENBERG:  And, Your Honor, that is exactly what
17  we've proposed here.
18          THE COURT:  Well, that's a court order.  I'm saying an
19  affidavit, a private agreement between you-all, why would that not
20  have been enough?
21          MS. MARENBERG:  Well, if it had the force of law as
22  opposed to just in response as we have right now to a pleading
23  that we filed, then it would have some meat or teeth to it, but
24  right now all we have is an answer to a complaint or a motion to
25  dismiss that they've filed to which they've attached an affidavit.

1         In order to have a document, which was at the outset the
2    issue, is to have a document in hand that says "I agree to comply
3    with" or tracking the language of the nondisclosure agreement,
4    gives the plaintiffs in this case a legal standing.  I mean,
5    that's what needed to be translated into resolution of this case.
6         And what I would suggest to the Court is that what
7    happened here is that once the lawyer's letter -- and I think
8    Mr. Hyland perhaps neglected to focus on this -- but once the
9    lawyer's letter, the last one came, it specifically said to Midi's
10   counsel, who was not Mr. Hyland but a different lawyer, that put
11   those representations into an affidavit or declaration in order to
12   avoid this lawsuit regarding threatened misappropriation.
13        And I think, Your Honor, just back to the issue of for
14   the motion to dismiss, separate from the preliminary injunction,
15   in order to meet the elements necessary to get past dismissal, the
16   law is threatened misappropriation, which is different than
17   inevitable disclosure, which as the parties are aware and the
18   Court is aware is not recognized in this Court as well as not
19   recognized in many other courts, threatened misappropriation is a
20   viable cause of action for misappropriation of trade secrets, and
21   what Mr. Hyland is suggesting is that somehow the floodgates are
22   going to be opened.
23        They won't be opened, because what we have here, it's
24   not every employer who has a former employee that goes to work for
25   a competitor is subject to litigation.  It's an employee who goes

1  to work for a competitor who demonstrates an intent to
2  misappropriate based on the suspicion and the lack of candor and
3  the lack of forthrightness and the acts of omission that she
4  engaged in.
5         And the question is whether is that going to be
6  sufficient at the end of the day.  It's certainly sufficient to
7  get past a motion to dismiss I would submit, Your Honor.
8         Now, is this case resolvable?  Yes.  I would say it is
9  resolvable, but the issue before Your Honor is whether we have met
10 our burden in a motion to dismiss and then whether we've met the
11 burden with respect to a PI, and we have the indicia to
12 demonstrate intentional threatened misappropriation, far different
13 than someone coming in and saying, you know, Here's my downloaded
14 disk of all of my confidential information from my former
15 employee.  I'm giving it over to you, New Employer, so that I can
16 make as much money or make it as profitable as our former
17 employer.  That's not our case.
18         But the law is actual misappropriation, which is that
19 case, and threatened misappropriation, which has to be based on
20 behavior.  When you don't have actual statements, you have to look
21 at conduct.
22         THE COURT:  All right.
23         MS. MARENBERG:  And we can't get into her mind, but we
24 can look at what she's done, and that's sufficient to get us past
25 the motion to dismiss at this stage.  Then we deal with the

1  preliminary injunction.
2          I'm prepared to address that to you, Your Honor.
3          THE COURT:  You're not going to have to, Ms. Sokolove,
4  because in this case, while I recognize again the federal system
5  of notice pleading, there still has to be sufficient basis to
6  support a claim.
7          Under the specific facts of this case and because the
8  communications of counsel with the defendant are part of the
9  evidence or part of the facts alleged in the complaint, the Court
10 can look at those documents in making this evaluation.  I'm not
11 going beyond the complaint in looking at documents which are
12 critical to it.
13         Really the only evidence in my view that you've alleged
14 in the complaint is this letter -- are these letters that were
15 sent by counsel and the failure of the defendant to file or to
16 respond by providing an affidavit along the lines wanted.
17         That first letter from the plaintiff in my view was so
18 overheated and so strong that it would excuse anyone from not
19 responding to it.  It was truly unnecessary to be that strong that
20 early, and I think that overheated the situation.
21         There is simply in this case under this scenario of the
22 facts known to the plaintiff at this point, even under the
23 California law that talks about threatened misappropriation, the
24 mere fact that a highly placed employee leaves an employer without
25 giving them clear, you know, specific notice about leaving, goes

to work for a competitor, and refuses to sign very strong, misleading documents, in my view is not enough to establish even at the early pleading stages that there is enough evidence to believe that there's been a threatened misappropriation. So I am going to grant the motion to dismiss, which moots the issue about the preliminary injunction.

Now, having said that, I am a great believer in peace, all right? And I take the position that if parties that are before the Court are truly in good faith, that they should be able to have peace. So even though the defendant has won her day in court today, it would not in my view be unwise for counsel to now sit down in a less heated environment and see if an appropriate affidavit of the defendant would satisfy the plaintiff.

I can tell you in the other case that involved hundreds of millions of dollars, big-time competitors, I don't know what specifically they did, but the structure in which I know they settled the case was basically an affidavit or an informal statement by one side that it wasn't misusing, and I can't see why in the world that wouldn't satisfy both sides, especially -- now, this would be outside of the motion to dismiss -- if the defendant has within its employment agreement and has, in fact, contacted the plaintiff and said -- not the defendant, the defendant's new employer has said that it's part of her job obligations with them not to disclose any of the plaintiff's information. Obviously, they don't want to buy a lawsuit.

```
 1         So having said that, I suggest you go back, sit down,
 2  have a cup of coffee, try to work something out, but in any case,
 3  I have ruled on the motion to dismiss.  Thank you.
 4         MR. HYLAND:  Thank you, Your Honor.
 5         MS. MARENBERG:  Thank you, Your Honor.
 6                         (Which were all the proceedings
 7                          had at this time.)
 8
 9                    CERTIFICATE OF THE REPORTER
10     I certify that the foregoing is a correct transcript of the
11  record of proceedings in the above-entitled matter.
12
13
14                              _____
                                        Anneliese J. Thomson
15
16
17
18
19
20
21
22
23
24
25
```